# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

)
NORTHWEST ATLANTIC MARINE ALLIANCE )
200 Main Street, Suite A )
Saco, Maine  04072 )
)
MIDCOAST FISHERMEN'S ASSOCIATION )
450 Glenmere Road )
Port Clyde, Maine 04855 )
)
    Plaintiffs )
)
    v. )    No. _____
)
)
CARLOS M. GUTIERREZ, in his official capacity as )
Secretary of the United States Department of Commerce )
Department of Commerce, Room 5851 )
14th Street and Constitution Avenue, NW )
Washington, DC  20230 )
)
NATIONAL OCEANIC AND ATMOSPHERIC )
    ADMINISTRATION )
United States Department of Commerce )
Room 5128 )
1401 Constitution Avenue, N.W. )
Washington, D.C.  20230 )
)
NATIONAL MARINE FISHERIES SERVICE, )
Department of Commerce, Room 14555 )
1315 East-West Highway )
Silver Spring, MD  20910 )
)
    Defendants. )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

    1.    The plaintiffs Northwest Atlantic Marine Alliance ("NAMA") and Midcoast

Fishermen's Association ("MFA") hereby challenge the failure on the part of the defendants

Secretary of Commerce Carlos M. Gutierrez, the National Oceanic and Atmospheric

Administration, and the National Marine Fisheries Service (hereinafter collectively referred to as "defendants" or as "Fisheries Service" or as "NMFS") to comply with the overfishing, rebuilding, and bycatch requirements of the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), as amended in 1996 by the Sustainable Fisheries Act ("SFA") and by the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006 ("MSRA").  Specifically, the plaintiffs challenge defendants' arbitrary and capricious rejection of plaintiffs' October 12, 2007 petition (Exhibit A) that requested defendants to exclude certain fishing vessels from areas of the ocean in New England waters that have been closed to virtually all fishing in order to protect depleted populations of groundfish. This illegal action by the defendants allows these fishing vessels to kill thousands of pounds of depleted groundfish and thereby to perpetuate the overfished condition of the groundfish in New England.

2.    Many New England groundfish populations have been severely depleted and have teetered on the brink of collapse for decades.  The June 2007 National Marine Fisheries Service ("NMFS" or "Fisheries Service") Status of the U.S. Fisheries Report concludes that despite changes to the groundfish management plan over the past several years that were predicted to end overfishing  and rebuild stocks, overfishing continues on 8 of 19 groundfish stocks, and that there are still 13 groundfish stocks that remain overfished.  NATIONAL MARINE FISHERIES SERVICE, *Report on the Status of the U.S. Fisheries for 2006*, 7, 19 (June 22, 2007).

3.    Despite the precarious status of groundfish, and in clear violation of the MSA and the Administrative Procedure Act ("APA"), the Fisheries Service has refused to provide meaningful protection to groundfish spawning grounds critical to groundfish recovery efforts.  In particular, the Fisheries Service ignored the best available science and rejected the October 12, 2007 petition filed by the plaintiffs asking NMFS to prohibit herring fishermen using midwater

trawl gear – gear now known to catch significant amounts of adult and juvenile groundfish –

from fishing within the groundfish closed areas where they kill adult and juvenile groundfish as

"bycatch."  This decision by the Fisheries Service rejected specific practicable fishery

management measures supported by the best available science that would help prevent continued

overfishing of New England groundfish, help to rebuild the severely depleted groundfish

populations, and minimize groundfish bycatch.

## APPLICABLE STATUTES, JURISDICTION, AND VENUE

4.      This action arises under the MSA, 16 U.S.C. §§ 1801-1883 and the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

5.      This Court has jurisdiction over this action pursuant to the MSA.  That statute

provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any

case or controversy arising under" the MSA. 16 U.S.C. § 1861(d).  The MSA also provides that

actions taken by the Secretary of Commerce under regulations that implement a fishery

management plan shall be subject to judicial review "if a petition for such review is filed within

30 days after the date on which the regulations are promulgated or the action is published in the

Federal Register, as applicable."  16 U.S.C. § 1855(f).  In this case, defendants denied the

plaintiffs' October 12, 2007 petition by issuing an undated  letter that was received electronically

by counsel for the plaintiffs on November 29, 2007.  (Exhibit B).  Plaintiffs are filing this

Complaint within thirty (30) days after electronic receipt of that undated letter.

6.      This Court also has federal question jurisdiction over this action pursuant to 28

U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising

under the . . . laws . . . of the United States" and 28 U.S.C. § 1361, which grants the district

courts "original jurisdiction of any action in the nature of mandamus to compel an officer or

employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

7.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because the

Fisheries Service defendants are located in this district and a substantial part of the events or

omissions giving rise to the claim occurred here.

8.      This Court may issue a declaratory judgment in this case pursuant to the

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and may grant relief pursuant to the MSA,

16 U.S.C. §§ 1861(d) and 1855(f), as well as the APA, 5 U.S.C. § 706.

## DESCRIPTION OF THE PARTIES

9.      Plaintiff Northwest Atlantic Marine Alliance ("NAMA") is a non-profit

organization of New England coastal communities, family owned fishing businesses, regulators,

researchers, conservation organizations, and recreational groups headquartered in Saco, Maine.

NAMA is dedicated to restoring and enhancing an enduring Northwest Atlantic marine system

that supports a healthy diversity and abundance of marine life and human uses.  NAMA's

objective is to establish a public voice and institutional presence that is centered on ecological

and economic stability, personal responsibility and accountability, resource protection and

distributed power and authority.  NAMA and its member organizations, including the Midcoast

Fishermen's Association, the Stonington Fisheries Alliance, and the New Hampshire Marine

Coalition, collectively represent over 100 commercial fishermen and community members.  Over

the past 10 years, NAMA has been looked to and counted on by the family owned small boat

inshore fishing fleet for leadership and hope for restoring New England's fisheries and

preserving their livelihood.  This  underrepresented "silent majority" is being displaced and has

faced a disproportionate burden of  the groundfish recovery efforts in New England.  NAMA's

work includes efforts to develop alternative fisheries management approaches that would restore and conserve fish populations.  NAMA pursues its work through various means, including convening diverse stakeholders around solutions to complex marine resource problems and by working with fishermen, conservation organizations, researchers, management entities, businesses, and community members who have a stake in the future of the conservation and sustainable management of the Northwest Atlantic Ocean.  The interests and work of NAMA and its members are directly and adversely affected by the failure of the Fisheries Service to prevent overfishing of groundfish, rebuild depleted groundfish populations, and to prevent and/or minimize the bycatch of groundfish by midwater trawl vessels fishing for herring in groundfish closed areas.  Moreover, unless the relief sought in this complaint is granted, those interests will continue to be adversely affected and irreparably injured by the Fisheries Service's unlawful failure to perform its non-discretionary duties under the MSA and the APA.

10.    Plaintiff Midcoast Fishermen's Association ("MFA") is a non-profit organization of over 40 fishermen and other members of their community located in Port Clyde, Maine.  Due to the loss of many small family fishing businesses as a result of the decline of New England's groundfish fishery, Port Clyde today is considered the easternmost groundfish port remaining in New England.  The MFA was formed in response to the view shared by Port Clyde fishermen that poor decision-making by fishery managers is slowly eliminating New England's fleet of small and mid-size vessels in favor of a much smaller fleet of larger vessels.  MFA believes that this trend provides less conservation and destroys the opportunity for traditional fishing families to earn a living through fishing.  As a result, this trend harms the MFA and its members by making it more difficult for them to preserve the way of life they have enjoyed for decades. Hence, the MFA is dedicated to developing practical solutions to groundfish management

problems that will restore and conserve groundfish in order to create fishing opportunities for its members and for other current and future Maine fishermen. The MFA's work includes a proposal currently before the New England Fishery Management Council known as "area management" that would change the scale of management and shift some of the management responsibility closer to local fishermen and other stakeholders in order to increase conservation and improve fishermen's flexibility to operate their businesses. An important part of the proposal is the introduction of rules that would result in the use of gear and fishing practices that limit bycatch and the ecological impacts of fishing in order to restore the annual migration of fish to the inshore areas and spawning grounds that sustained the fishery for centuries. Related to this concept is the MFA's view that the practice of herring midwater trawling in groundfish closed areas is having a negative impact on the recovery of fish along the coast of Maine. Several areas have been set aside as sanctuaries for groundfish and are intended to be seed areas where fish stocks can recover unmolested and help with the groundfish recovery throughout the region. However, because midwater trawlers catch significant amounts of depleted groundfish in these areas, the MFA supports closing these areas to all fishing, with the exception of fisheries like lobstering that have a very small impact on the groundfish resource. The interests and work of the MFA are directly and adversely affected by the failure of the Fisheries Service to prevent overfishing of groundfish, to accomplish the rebuilding goals for groundfish, and to prevent and/or minimize the bycatch of groundfish by herring midwater trawl vessels in groundfish closed areas. Moreover, unless the relief sought in this complaint is granted, those interests will continue to be adversely affected and irreparably injured by the Fisheries Service's unlawful failure to perform its non-discretionary duties under the MSA and the APA.

11.     Defendant Carlos M. Gutierrez is Secretary of the United States Department of Commerce.  He is sued in his official capacity as the chief officer of the Department charged with overseeing the proper administration and implementation of the MSA, including those MSA, SFA, and MSRA provisions that require an end to overfishing and that mandate the minimization of bycatch.

12.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is an agency of the United States Department of Commerce with supervisory responsibility for the National Marine Fisheries Service.  The Secretary of the Department of Commerce has delegated responsibility to ensure compliance with the MSA, the SFA, and the MSRA to NOAA, which in turn has sub-delegated that responsibility to the National Marine Fisheries Service.

13.     Defendant National Marine Fisheries Service ("NMFS" or "Fisheries Service") is an agency of the United States Department of Commerce that has been delegated the responsibility to review Fishery Management Plans ("FMPs") and amendments to those plans, and to issue implementing regulations.  NMFS is the United States government agency with primary responsibility to ensure that the requirements of the MSA, SFA, and MSRA are followed and enforced, including the requirements to end overfishing, to rebuild overfished populations of fish, and to minimize bycatch.

## LEGAL AND FACTUAL BACKGROUND

### Legal and Regulatory Framework for Management of New England Groundfish

14.     The MSA, as amended by the SFA and MSRA, establishes a system for conserving and managing fish populations in the exclusive economic zone of the United States, which generally extends from the boundaries of state waters to 200 miles offshore.  The MSA

requires the Fisheries Service to conserve and manage fish populations pursuant to a number of "National Standards" and certain other requirements.

15      The MSA creates eight regional fishery management councils and requires them to prepare fishery management plans ("FMPs") for all fisheries under their authority that require conservation and management.  16 U.S.C. §1852(h)(1).  All FMPs and regulations implementing FMPs are subject to final review and approval of the Fisheries Service to ensure that they comply with the requirements of the MSA, as well as with other applicable laws and requirements.  16 U.S.C. § 1854(a), (b).

16.      In enacting the MSA, Congress found that:

> Certain stocks of fish have declined to the point where their survival is threatened, and other stocks of fish have been so substantially reduced in number that they could become similarly threatened as a consequence of (A) increased fishing pressure, (B) the inadequacy of fishery resource conservation and management practices and controls....

> Fishery resources are finite but renewable.  If placed under sound management before overfishing has caused irreversible effects, the fisheries can be conserved and maintained so as to provide optimum yields on a continuing basis.

16 U.S.C. § 1801(a)(2), (5).

17.      National Standard One of the MSA requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery . . . ." 16 U.S.C. § 185l(a)(1).

18.      National Standard Two of the MSA requires that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).

19.      The MSA requires that the Fisheries Service identify overfished fish populations and manage those populations by attaining the optimum yield that will rebuild them to a healthy

population level. 16 U.S.C. § 1802(28)(C) (optimum yield for an overfished fishery provides for

rebuilding the population); 16 U.S.C. § 1853(a)(10) (FMPs must "specify objective and

measurable criteria for identifying when the fishery to which the plan applies is overfished" and

"contain conservation and management measures to prevent overfishing or end overfishing and

rebuild the fishery"); 16 U.S.C. § 1854(e) (requirements to identify overfished fisheries, to end

overfishing immediately, and to rebuild overfished fisheries as soon as possible).

20.    The MSA also requires that, prior to 2010, fishery management councils must

develop annual catch limits for all fisheries where overfishing is occurring.  Such annual catch

limits: (i) cannot exceed the recommendations of the councils' science and statistical

committees; (ii) must be set at a level such that overfishing does not occur in the fishery; and (iii)

must include measures to ensure accountability.  16 U.S.C. §1852(h)(6); §1853(a)(10); §1853

(note establishing effective dates).

21.    National Standard Nine of the MSA requires that conservation and management

measures must, to the extent practicable, avoid or minimize bycatch and bycatch mortality. 16

U.S.C. § 1851(a)(9).

22.    The MSA also requires that FMPs must

> establish a standardized reporting methodology to assess the amount and type of
> bycatch occurring in the fishery, and include conservation and management
> measures that, to the extent practicable and in the following priority --
> (A) minimize bycatch; and
> (B) minimize the mortality of bycatch which cannot be
> avoided[.]

16 U.S.C. § 1853(a)(11).

23.    "Maximum sustainable yield" ("MSY") means "the largest long-term average

catch or yield that can be taken from a stock or stock complex under prevailing ecological and

environmental conditions." 50 C.F.R. § 600.310(c)(1)(i).

24.     Fish stock size is measured in terms of biomass ("B"), the aggregate mass of the fish in the stock.

25.     The biomass "consistent with producing the maximum sustainable yield on a continuing basis," 16 U.S.C. § 1802(28)(C) (optimum yield for a rebuilding stock), is referred to as "Bmsy" and is the target biomass for New England's groundfish rebuilding plan.

26.     The National Marine Fisheries Service through its Northeast Multispecies FMP (hereinafter "New England Groundfish FMP" or "Groundfish FMP") seeks to manage nineteen different groundfish stocks.  Due to persistent overfishing and the continually depleted status of the groundfish stocks, the New England Fishery Management Council (NEFMC) and NMFS have designed and implemented an increasingly complex suite of conservation and management measures over the years.  These measures are designed to limit groundfish mortality and protect juvenile and spawning fish by reducing the fishing effort of groundfish fishermen in the multispecies fishery and reducing the bycatch of groundfish in other fisheries.  The New England Groundfish FMP, and in particular the 2004 amendment and 2006 framework adjustment, is intended to end overfishing, rebuild overfished stocks, and minimize bycatch and minimize bycatch mortality where it cannot be avoided.  *See* Amendment 13 to the Northeast Multispecies FMP, I-6, (December 18, 2003); Framework Adjustment 42 to the Northeast Multispecies FMP, 41 (April 21, 2006); *see also* NMFS Final Rule Northeast Multispecies Framework Adjustment 42, 71 Fed Reg 62156 (Oct. 23, 2006).

27.     In the Groundfish FMP, permanent and seasonal closed areas have been established beginning in 1994 in order to help end overfishing and to rebuild depleted groundfish stocks.  Through these closures, groundfish fishing vessels and other fishing vessels capable of catching groundfish are excluded from fishing in the closed areas in order to reduce groundfish

mortality and to protect juvenile and spawning fish.  *See, e.g.,* 59 Fed. Reg. 63,926, 63,928 (Dec. 12, 1994); 63 Fed. Reg. 15,326, 15,327 (Mar. 31, 1998); 64 Fed. Reg. 2601, 2601 (Jan. 15, 1999); 50 C.F.R. § 648.81.

28.     Rules promulgated by the Secretary of Commerce in 1998 allowed pelagic midwater trawl fishing vessels to fish in the groundfish closed areas based on the assumption that midwater trawl vessels either do not catch groundfish, or catch only "negligible" amounts of groundfish.  63 Fed. Reg. 7727, 7728-29 (Feb. 17, 1998).

29.      The Secretary of Commerce has a responsibility to carry out any fishery management plan or amendment approved or prepared by him in accordance with the MSA.  16 U.S.C. § 1855(d).  The Secretary may promulgate such regulations, pursuant to APA rulemaking procedures, that may be necessary to carry out this responsibility or to carry out any other provisions of the MSA.  *Id.*

30.     Additionally, the Secretary is authorized to promulgate emergency regulations or interim measures to reduce overfishing or if an emergency situation exists within a given fishery. *Id.* § 1855(c)(1).

31.     An emergency rule or an interim measure is treated as an amendment to a fishery plan for the period it is in effect.  *Id.* § 1855(c)(3).  NMFS policy guidelines explain that an emergency situation in a given fishery:

> (1) Results from recent, unforeseen events or recently discovered circumstances; and
> (2) Presents serious conservation or management problems in the fishery; and
> (3) Can be addressed through emergency regulations for which the immediate benefits outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on participants.  62 Fed. Reg. 44,421-44,422 (Aug. 21, 1997).

Emergency rulemaking may be initiated if notice and comment rulemaking "would result in substantial damage or loss to a living marine resource" and immediate action is necessary to "prevent overfishing" or "other serious damage to the fishery resource or habitat." *Id.*

32.    The APA provides that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). Agencies must respond to petitions within a reasonable time, to "proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). If such petitions are denied the agency must provide "a brief statement of the grounds for denial." *Id.* § 555(e).

33.    The APA requires courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise contrary to law," and to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706.

## <u>Overfishing and Bycatch of Groundfish in New England</u>

34.    Many New England groundfish populations have been severely depleted or fished to the point of near collapse for many years. Principal New England groundfish include species such as cod, haddock, and yellowtail flounder and today are managed as 19 different stocks in a "multispecies" fishery. Management of the New England groundfish fishery is complicated by the use of non-selective fishing gear, so that even if limits are placed on targeted fishing on one species, such as cod, fishing for another species of groundfish or other fish may result in large amounts of bycatch and bycatch mortality of the non-targeted species. Hence, to restore depleted groundfish populations to healthy levels, strict conservation measures are required to control both targeted fishing and bycatch.

35.    The New England groundfish fishery has long been a national symbol of the failure of our nation's fishery policy. The fishery has suffered three dramatic recent collapses.

From 1966-1970, overfishing by international fleets of factory-based trawlers devastated the fishery. *See* Steven A. Murawski, et al., *New England Groundfish in Our Living Oceans* 71, 76-77 (United States Dep't of Commerce 1999). This collapse was one of the main reasons Congress enacted the Magnuson Fishery Conservation and Management Act (FCMA) in 1976. *See id.* at 77; *see also* 142 Cong. Rec. 10910 (daily ed. Sept. 19, 1996) (statement of Sen. Chafee).

36.    FCMA's ban on foreign factory trawlers did not succeed in resuscitating the New England groundfish fisheries – instead, defendants' mismanagement allowed American fishermen to severely overfish the resource. As a result, by the mid-1980s, the groundfish stocks had crashed again. *See* Murawski at 78; *see also* 142 Cong. Rec. at 10910.

37.    Defendants were sued in 1991 to redress their failure to prevent overfishing in the groundfish fishery and a consent decree established a timetable for the Fishery Service to develop a plan to rebuild the overfished groundfish to a healthy population size. *See Conservation Law Found. of New England v. Mosbacher*, 966 F.2d 39, 41 (1st Cir. 1992).

38.    Notwithstanding these developments, defendants' efforts proved inadequate. It took three years for defendants to propose stronger conservation measures in response to the 1991 lawsuit, yet these measures were insufficient to prevent further collapses of groundfish stocks in the mid-1990s. *See* 142 Cong. Rec. at 10910; National Marine Fishery Service, NOAA, Report of the 18th Northeast Regional Stock Assessment Workshop (18th SAW): The Plenary 42, 53 (1994). Because Congress judged, in large part from the crisis in New England, that FCMA's conservation requirements were not strict enough, it enacted the Sustainable Fisheries Act in 1996 (SFA). *See*, *e.g.*, *id.*; 142 Cong. Rec. 10794 (daily ed. Sept. 18, 1996) (statement of Sen. Kerry).

39.     In fact, over half of the New England groundfish stocks whose stock size was known were listed as overfished following passage of the SFA. *See* National Marine Fisheries Service, *Report to Congress: Status of Fisheries of the United States* 9-10 (October 1999) (13 of 21 stocks whose size is known are overfished).

40.     The Fisheries Service was taken to court again, and on December 28, 2001, the United States District Court for the District of Columbia (Kessler, J.) entered summary judgment in favor of the plaintiff conservation groups and ordered defendants to promulgate and implement an amendment to the Groundfish FMP not later than May 1, 2004 that complied with the overfishing, rebuilding, and bycatch requirements of the SFA. *Conservation Law Foundation v. Evans*, 209 F. Supp. 2d 1 (D.D.C. 2001).

41.     On April 27, 2004 the defendants published a final rule implementing "Amendment 13" to the Groundfish FMP.  69 Federal Register 22906 (April 27, 2004).  The measures contained in Amendment 13 and in the final rule implementing that Amendment were again challenged as not in compliance with the MSA and SFA's overfishing, rebuilding, and bycatch provisions.   Specifically, the measures contained in the Amendment 13 rebuilding plan allowed fishing at rates for some of the most depleted stocks significantly above the recommended levels that were based on the best available science as necessary to stop overfishing and rebuild depleted stocks.  Moreover, it was alleged that nothing in Amendment 13 demonstrated that the new measures were sufficient to ensure that even those excessive fishing rates are not exceeded.  Amendment 13 was also challenged because it did not include any standardized bycatch reporting methodology ("SBRM") for assessing the amount and type of bycatch occurring in the New England groundfish fishery.

42. While the conservation groups again won on the SBRM claim, the court did not accept the conservation groups challenges to the overfishing and rebuilding provisions in Amendment 13. *Oceana v. Evans*, 2005 WL 555416 (D.D.C.). In turn, Congress again looked to the New England groundfish crisis in enacting MSRA provisions that make even more clear that overfishing must be stopped immediately, even for rebuilding stocks, 16 U.S.C. § 1854(e)(3)(A), and that all FMPs must contain science-based annual catch limits and accountability measures that ensure overfishing is prevented. *See* 16 U.S.C. §§ 1852(h)(6), 1853(a)(15).

43. Beginning in 1994, in response to the collapse of haddock, flounder, and cod stocks, areas of the ocean off New England were closed on a permanent and seasonal basis to groundfishermen and other fishermen using gear capable of catching groundfish in order to reduce groundfish mortality and to protect juvenile and spawning fish to aid in recovery efforts. *See, e.g.,* 59 Fed. Reg. 63,926, 63,928 (Dec. 12, 1994); 63 Fed. Reg. 15,326, 15,327 (Mar. 31, 1998); 64 Fed. Reg. 2601, 2601 (Jan. 15, 1999); 50 C.F.R. § 648.81.

44. Rules promulgated by the Secretary in 1998 (implementing "Framework Adjustment 18" to the Groundfish FMP) allowed pelagic midwater trawl fishing vessels into the closed areas based on the assumption that midwater trawl fishing gear either does not catch groundfish, or catches only "negligible" amounts of groundfish. 63 Fed. Reg. 7727, 7728-29 (Feb. 17, 1998).

45. In view of this history and additional new information, the plaintiffs filed a Petition for Rulemaking with the defendant Secretary of Commerce on October 12, 2007 seeking to exclude midwater trawl ships from groundfish closed areas (Exhibit A).

46.    "Midwater" trawl vessels fish by dragging very large nets behind their vessels, and at times operate in pairs as "pair trawls" so they can drag even larger nets behind them. These nets have small mesh so they can capture herring and other small fish like mackerel.  The fishing gear is characterized as "midwater" trawl gear because it was originally intended to be fished in the middle of the water column where pelagic species like herring are commonly found, especially at night.  However, the gear is often fished at the bottom of the water column where herring often can be found during the day and where the nets capture juvenile and adult groundfish as bycatch, along with various types of marine debris and rocks.

47.    Contrary to the premise contained in Framework Adjustment 18, recent data show that midwater trawl vessels catch juvenile and adult groundfish, often in significant amounts. For example, observer data from 46 observed midwater trawl trips in 2006 showed bycatch of haddock totaling over 18,000 pounds, redfish totaling nearly 7,000 pounds, and Pollock, cod, plaice, and flounder totaling 70 pounds.

48.    In addition, in 2004, NMFS took enforcement action against herring midwater trawl vessels that were found illegally attempting to land thousands of pounds of juvenile haddock and hake bycatch in Maine and Massachusetts.  One of these vessels alone was estimated to have as much as 30,000-48,000 pounds of juvenile haddock on board, which can reasonably be estimated to be the equivalent of three to five times that amount of haddock had it been allowed to grow to maturity.  When groundfish are allowed to grow to maturity they also have the opportunity to spawn, thus aiding in groundfish rebuilding efforts.

49.    After these well publicized enforcement actions, the midwater trawl industry acknowledged the fact it was catching significant amounts of groundfish as bycatch, and stated that if, and when, groundfish populations rebuild, midwater trawls vessels will not be able to

avoid catching increasing amounts of groundfish as bycatch.  See Final Rule Implementing Framework Adjustment 43 to the Northeastern Multispecies FMP, 71 Fed. Reg. 46871, 46874 (April 16, 2006).

50.     The Fisheries Service does not attempt to estimate the amount of bycatch occurring in the fishery, and instead simply records the amount that is actually observed in its current program.  However, as described in the plaintiffs' October 12, 2007 petition and in an additional letter submitted by the plaintiffs to the Fisheries Service dated November 20, 2007 (Exhibit C), based on current information it is reasonable to develop better estimates of the levels of groundfish bycatch occurring in the herring midwater trawl fishery through extrapolation. For example, if available data from 2004 to 2006 are extrapolated based on the levels of observer coverage (and on the assumption that most of the observed bycatch of groundfish were juveniles that if allowed to grow to maturity would have weighed 3-5 times their captured weight), the amount of groundfish bycatch would be even more significant, approximately:

|  | by weight | equivalent adult weight  of juveniles (4x) |
|---|---|---|
| o | 2004 over 500,000 pounds | 2 million pounds |
| o | 2005 over 200,000 pounds | 800,000 pounds |
| o | 2006 over 800,000 pounds | 3.2 million pounds |

51.     The June 2007 National Marine Fisheries Service (NMFS) report on the status of U.S. fisheries shows that the changes to the groundfish management plan over the past several years have not ended overfishing on 8 of 19 groundfish stocks, and that there are still 13 of 19 groundfish stocks that remain overfished.   NATIONAL MARINE FISHERIES SERVICE, *Report on the Status of the U.S. Fisheries for 2006*, 7, 19 (June 22, 2007).

52.     The situation is dire for stocks like Georges Bank cod and Gulf of Maine cod, which are estimated to be at only 10 and 23 percent, respectively, of target biomass levels.  2005

GROUNDFISH ASSESSMENT REVIEW MEETING at 2-4, 2-156. ("2005 GARM"). Biomass estimates for white hake show that it is at less than 50 percent of its target biomass level, while the three stocks of yellowtail flounder, along with Georges Bank winter flounder, are dismally low. *Id.* at viii; 2-83, 2-104, 2-129, 2-327, 2-342. Remarkably, all of these stocks continue to suffer from overfishing. *Report on the Status of the U.S. Fisheries for 2006* at 19. Gulf of Maine and Georges Bank haddock continue to be considered overfished, as are American plaice, Southern New England windowpane flounder, ocean pout, and Atlantic halibut. *Id.* The 2005 GARM report also shows that none of the 19 stocks of groundfish have been rebuilt to their target biomass levels, which would produce MSY on a continuing basis.

53.     In addition, as part of their petition plaintiffs showed that a 2007 scientific review concluded that the use of closed areas to reduce groundfish mortality and to protect spawning and juvenile groundfish holds promise as a method for reducing overfishing of groundfish and rebuilding overfished stocks. The review found an increase in biomass of several species of groundfish within closed areas and in surrounding areas when they are implemented. Fogarty, Mike, *Efficacy of Fishery Closures in the Gulf of Maine*, *in* WESTERN GULF OF MAINE CLOSURE AREA SYMPOSIUM, 23-25 (2007).

54.     The best available science indicates that bycatch in the herring midwater trawl fishery is likely underestimated due to existing deficiencies in the monitoring program for these vessels, including insufficient levels of observer coverage.

55.     Recent scientific analysis of the bycatch monitoring program for the midwater trawl fishery demonstrates that the program does not meet NMFS' own standards. As a result, the full impact of the midwater trawl fishery on groundfish is not known. Moreover, the level of certainty demanded by the existing rule is unlikely to be met in the immediate future under the

existing bycatch monitoring program because of low levels of observer coverage in the fishery and flawed sampling protocols that fail to reliably account for bycatch.

56.     In response to prior court orders, NMFS recently proposed a new SBRM that shows that there are currently insufficient levels of observer coverage on the midwater trawl fleet. Final Draft Northeast Region Standardized Bycatch Reporting Methodology, C-44 (June 2007).  An independent peer review of the proposed SBRM indicates that the current bycatch monitoring program does not reliably estimate the amount of bycatch occurring and the gap between actual and needed observer coverage is even greater than previously believed.

57.     In response to the plaintiffs' petition, on November 29, 2007 the Fisheries Service sent an undated one page letter to counsel for the plaintiffs by electronic mail in which it declined to take immediate action to exclude midwater trawlers from groundfish closed areas. (Exhibit B).  This letter appears to also decline the plaintiffs' request that the Fishery Service initiate both emergency and permanent rulemaking to exclude midwater trawl ships from the closed areas.

58.     As a result of the Fisheries Service decision to deny the plaintiffs' petition, midwater trawl fishing vessels will continue to operate in areas of the ocean off New England that are otherwise closed to fishing with gear capable of catching groundfish and will continue to kill significant amounts of groundfish in those areas.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### THE DEFENDANTS' DECISION TO DENY PLAINTIFFS' PETITION
### VIOLATES THE ADMINISTRATIVE PROCEDURE ACT

59.     The plaintiffs reallege and incorporate by reference paragraphs 1 - 58 of this Complaint in this First Claim for Relief.

60.     The APA mandates that a "reviewing court shall hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

61.     The defendants' premise for allowing fishing vessels using midwater trawl gear into groundfish closed areas was that they caught no, or only negligible amounts, of groundfish. This erroneous factual premise formed the basis for the regulation that currently allows midwater trawl vessels into the groundfish closed areas – areas closed to fishing gear capable of catching groundfish in order to decrease groundfish mortality and protect groundfish spawning grounds.

62.     In fact, as was demonstrated in the plaintiffs' petition and reinforced in a follow-up letter to the Fisheries Service, midwater trawl ships catch significant amounts of groundfish.

63.     The Fisheries Service's November 29, 2007 letter denying plaintiffs' petition asserts that NMFS has considered prohibiting midwater trawl fishing gear in the closed areas before, and has determined the bycatch of New England multispecies was not sufficient to justify such action.  However, these are conclusory statements and the Fisheries Service provides no supporting evidence.

64.     The Fisheries Service also claims that the "observer data available continue to suggest that bycatch levels are within the range considered acceptable by the Council."  Again, the Fisheries Service letter makes no effort to support this statement either factually or legally.

65.     The remainder of the Fisheries Service's response to the plaintiffs' petition focuses only on whether or not the information presented in the petition is "significant new information" that would justify an emergency response, and thus does not discuss the larger question of whether permanent rulemaking should have been initiated.  The Fisheries Service

also provides no discussion of its determination that all of the recent information described in detail in the plaintiffs' petition does not constitute significant new information.

66.    These actions and failures to act by the Fisheries Service are arbitrary, capricious, and contrary to law in violation of the APA.  These actions and failures also constitute actions that have been both unlawfully withheld and unreasonably delayed in violation of the APA.

67.    These violations of the APA by the Fisheries Service threaten the plaintiffs with irreparable injury for which they have no adequate remedy at law.

**SECOND CLAIM FOR RELIEF:**
**THE DEFENDANTS' DECISION TO DENY PLAINTIFFS' PETITION FAILS TO PREVENT OVERFISHING AND REBUILD DEPLETED GROUNDFISH POPULATIONS**

68.    The plaintiffs reallege and incorporate by reference paragraphs 1 - 58 of this Complaint in this Second Claim for Relief.

69.    National Standard 1 of the MSA requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1).

70.    The MSA requires the Fisheries Service to promulgate and implement a fishery management plan for groundfish that prevents overfishing and rebuilds overfished fish populations.  16 U.S.C. § 1854(e).

71.    A fishery management plan for groundfish has existed for several years and the Fisheries Service has issued several fishery management plan amendments seeking to address overfishing and the depleted condition of groundfish stocks.  In 2004, the Fishery Service took action that was intended, once again, to end overfishing.  It also finally established a rebuilding plan for overfished groundfish stocks.  Notwithstanding these actions, eight of nineteen managed

groundfish stocks continue to suffer from overfishing, 13 remain overfished, and all 19 are below their target biomass levels.

72.     In their November 29, 2007 letter denying the plaintiffs' petition, the Fisheries Service refused to take action to exclude midwater trawl vessels from the groundfish closed areas in order to minimize groundfish bycatch or avoid the killing of groundfish as bycatch.  This source of mortality for juvenile and mature groundfish was not addressed in the amendment to the Groundfish FMP or any subsequent adjustments to the rebuilding plan because of the original incorrect premise that midwater trawl vessels do not catch groundfish.

73.     The Fisheries Service's November 29, 2007 decision, which leaves in place regulations permitting midwater trawl vessels to fish in groundfish closed areas, fails to prevent overfishing and promote rebuilding of overfished groundfish populations, notwithstanding the requirements contained in the MSA.

74.     These actions and failures to act by the Fisheries Service violate the MSA.

75.     These actions and failures to act by the Fisheries Service are arbitrary, capricious, and contrary to law in violation of the APA.  These actions and failures also constitute actions that have been both unlawfully withheld and unreasonably delayed in violation of the APA.

76.     These violations of the MSA and the APA by the Fisheries Service threaten the plaintiffs with irreparable injury for which they have no adequate remedy at law.

**THIRD CLAIM FOR RELIEF:**
**THE DEFENDANTS' DECISION TO DENY PLAINTIFFS' PETITION FAILS TO AVOID OR MINIMIZE BYCATCH OF GROUNDFISH**

77.     The plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 58 of this Complaint in this Third Claim for Relief.

78.    National Standard Nine of the MSA requires that conservation and management measures must, to the extent practicable, avoid or minimize bycatch and bycatch mortality. 16 U.S.C. § 1851(a)(9).

79.    The MSA also requires that FMPs must "establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery" and include practicable measures to minimize bycatch and bycatch mortality. 16 U.S.C. § 1853(a)(11).

80.    In their November 29, 2007 letter denying the plaintiffs' petition, the Fisheries Service refused to take action necessary to minimize or avoid bycatch of groundfish in the groundfish fishery, and instead left in place regulations that violate the MSA's mandate to minimize bycatch and bycatch mortality.  In that decision, the Fisheries Service refused to take the practicable step of prohibiting fishing vessels using midwater fishing trawl gear from fishing in the groundfish closed areas despite clear evidence that such gear catches significant amounts of groundfish as bycatch.

81.    The Fisheries Service's decision is contrary to the premise for the regulation that allowed the use of midwater trawl gear in groundfish closed areas and ignores the fact that the fishing  vessels in question  are capable of fishing with other fishing gear, such as purse seine gear, that have lower levels of bycatch and bycatch mortality.

82.    The Fisheries Service's decision also demonstrates that it failed to establish a standardized reporting methodology for reliably monitoring and assessing the amount of groundfish bycatch occurring in the herring midwater trawl fishery.

83.   The defendants' November 29, 2007  denial of the plaintiffs' petition therefore does not comply with the requirements of National Standard Nine and the bycatch reporting requirements of the MSA.

84.    These actions and failures to act by the Fisheries Service violate the MSA.

85.    These actions and failures to act by the Fisheries Service are arbitrary, capricious, and contrary to law in violation of the APA.  These actions and failures also constitute actions that have been both unlawfully withheld and unreasonably delayed in violation of the APA.

86.    These violations of the MSA and the APA by the Fisheries Service threaten the plaintiffs with irreparable injury for which they have no adequate remedy at law.

### FOURTH CLAIM FOR RELIEF:
### THE DEFENDANTS' DECISION TO DENY PLAINTIFFS' PETITION FAILS TO RELY UPON THE BEST SCIENTIFIC INFORMATION AVAILABLE

87.    The plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 - 58 of this Complaint in this Fourth Claim for Relief.

88.    National Standard 2 of the MSA requires that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2).

89.    The best scientific information available demonstrates that: (i) overfishing is occurring in the groundfish fishery and that several stocks of groundfish remain overfished despite recent management efforts to end overfishing and rebuild stocks;  (ii) closing areas of high groundfish abundance and spawning areas to fishing with gear capable of catching groundfish reduces mortality of groundfish and helps groundfish stocks to recover from depleted levels; (iii) herring midwater trawl vessels kill significant amounts of juvenile and mature groundfish in the New England closed areas; and (iv) the groundfish bycatch problem in the herring midwater trawl fishery is likely much more severe than currently described and that significant improvements in the bycatch monitoring program are needed to establish a scientifically sound program that would provide reliable estimates of the amount of bycatch actually occurring in the fishery.

90.     In their November 29, 2007 letter rejecting plaintiffs' petition, the Fisheries

Service disregarded the best scientific information available and refused to exclude midwater

trawl fishing vessels from groundfish closed areas.

91.     The Fisheries Service's November 29, 2007 decision that leaves in place current

regulations that allow midwater trawl vessels into groundfish closed areas therefore is not based

upon the best scientific information available.

92.     These actions and failures to act by the Fisheries Service violate the MSA.

93.     These actions and failures to act by the Fisheries Service are arbitrary, capricious,

and contrary to law in violation of the APA.  These actions and failures also constitute actions

that have been both unlawfully withheld and unreasonably delayed in violation of the APA.

94.     These violations of the MSA and the APA by the Fisheries Service threaten the

plaintiffs with irreparable injury for which they have no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF:**
**THE DEFENDANTS' DECISION FAILS TO COMPLY WITH**
**THE MAGNUSON-STEVENS ACT'S PROVISIONS FOR EMERGENCY**
**REGULATIONS OR INTERIM MEASURES**

95.     The plaintiffs reallege and incorporate by reference the allegations contained in

paragraphs 1 - 58 of this Complaint in this Fifth Claim for Relief.

96.     Under the Magnuson-Stevens Act and existing regulations, the Secretary may

issue emergency regulations or establish interim measures to address overfishing or an

emergency.  16 U.S.C. § 1855(c)(1).

97.     Fisheries Service policy guidelines define emergency situations as those resulting

from recent, unforeseen events or recently discovered circumstances and that present a serious

conservation or management problem in the fishery that can be addressed through emergency

regulations, for which the immediate benefits outweigh the need for more deliberative consideration. 62 Fed. Reg. at 44,422.

98.    Fisheries Service policy guidelines further state that emergency regulations may be initiated if notice and comment rulemaking "would result in substantial damage or loss to a living marine resource" and immediate action is necessary to "prevent overfishing" or "other serious damage to the fishery resource or habitat." *Id.*

99.    The Fisheries Service's June 2007 report on the status of U.S. fisheries confirms that overfishing is occurring on several New England groundfish stocks.

100.    The June 2007 report represents the most recent and best available scientific data on the overfishing of New England's groundfish stocks, and further confirms that several groundfish stocks remain depleted – despite the most recent set of management actions taken in the Groundfish FMP that were predicted to solve these problems.

101.    A recent 2007 scientific review of the existing closed areas in New England shows that they hold significant promise for rebuilding depleted groundfish stocks.

102.    The most recent observer data released in 2007 shows that this promise is undermined by the mounting evidence that, contrary to the premise of the original rulemaking justifying the decision to allow midwater trawl vessels into closed areas, midwater trawl vessels catch significant amounts of juvenile and mature groundfish.

103.    Finally, recent 2007 analysis by NFMS of its bycatch monitoring program, and an even more recent independent peer review of that analysis, shows that the groundfish bycatch problem in the herring midwater trawl fishery is likely much more severe than currently estimated and that significant improvements in the program are needed to establish a

scientifically sound bycatch monitoring program that would provide reliable estimates of the amount of bycatch actually occurring in the fishery.

104.    The November 29, 2007 letter prepared by the Fisheries Service in response to plaintiffs' petition fails to demonstrate that NMFS gave reasoned consideration to the fact that overfishing is occurring on several groundfish stocks as a cause for issuing emergency regulations and interim measures to exclude midwater trawl ships from the groundfish closed areas, and that the amount of groundfish, including juvenile groundfish, caught by midwater trawl ship is contributing to the illegal overfishing that is occurring in New England.

105.    The letter prepared by the Fisheries Service in response to plaintiffs' petition also fails to demonstrate that NMFS carefully consider all of the recent information brought forward by the plaintiffs and undertook a reasoned evaluation of all the relevant factors for determining whether an emergency situation exists with regard to the groundfish fishery and management of groundfish closed areas.

106.    The failure by the Fisheries Service to adequately analyze the substantial damage and loss to groundfish populations and their spawning areas and to consider new information showing that immediate action is necessary to prevent overfishing or other serious damage to the groundfish resource as a result of midwater trawl ships operating in groundfish closed areas violates the MSA and constitutes an arbitrary and capricious action that violates the APA.

107.    These violations of the MSA and APA by the Fisheries Service threaten the plaintiffs with irreparable injury for which they have no adequate remedy at law.

## PRAYERS FOR RELIEF

WHEREFORE, the plaintiffs respectfully request this Court to enter the following relief:

1. Declare that the Fisheries Service's rejection of the plaintiffs' October 12, 2007 petition is arbitrary, capricious, and contrary to law, in violation of the APA.

2. Declare that the Fisheries Service has violated the MSA by rejecting the plaintiffs' October 12, 2007 petition, thereby failing to halt overfishing of groundfish stocks, rebuild depleted stocks, and minimize bycatch of groundfish.

3. Order the Fisheries Service to initiate rulemaking proceedings designed to permanently prohibit vessels from fishing with midwater trawl fishing gear in New England groundfish closed areas.

4. Further order the Fisheries Service to reconsider its decision not to take immediate action to issue emergency regulations and interim measures to prohibit the use of midwater trawl fishing gear in New England groundfish closed areas.

5. Provide plaintiffs all their reasonable costs, fees, and attorney fees.

6. Provide such other and further relief as the Court deems just and proper.

DATED this 28th day of December, 2007.

Respectfully submitted,

_____

STEPHEN E. ROADY
D.C. Bar. No. 926477
ROGER FLEMING
Maine Bar No. 8905
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C.  20036
202-667-4500 T   202-667-2356 F
Counsel for the Plaintiffs

_____

**Petition for Immediate and Permanent Rulemaking to Protect Groundfish
From Midwater Trawl Fishing In Northeastern Groundfish Closed Areas**

_____

Submitted to Secretary of Commerce Carlos M. Gutierrez
Office of the Secretary
Room 5554
United States Department of Commerce
14th Street and Constitution Avenue, NW
Washington, D.C. 20230

Submitted by:
Northwest Atlantic Marine Alliance (NAMA)
Midcoast Fishermen's Association (MFA)

October 12, 2007

Please Address Correspondence to:

Roger Fleming
Earthjustice
1042 Peabody Road
Appleton, Maine  04862
Phone: (978) 846-0612
Fax:  (207) 785-2231

## I.    INTRODUCTION

The Northwest Atlantic Marine Alliance (NAMA) and the Midcoast Fishermen's Association (MFA)("the Petitioners") hereby petition the Secretary of Commerce ("Secretary") to take emergency action to address continued overfishing in the Northeastern multispecies fisheries by excluding midwater trawl vessels from groundfish closed areas.

The June 2007 National Marine Fisheries Service (NMFS) report on the status of U.S. fisheries shows that the changes to the groundfish management plan over the past several years have not ended overfishing on 8 of 19 groundfish stocks, and that 13 stocks remain overfished. Meanwhile, mounting evidence shows that-- contrary to the assumptions made when midwater trawlers were allowed into groundfish closed areas-- such vessels catch juvenile and adult groundfish, at times in significant amounts.  The concern over the amount of groundfish bycatch actually occurring as a result of the midwater trawlers' access to groundfish closed areas is amplified by NMFS' own bycatch monitoring analysis released this summer and by an independent peer review of that analysis.  These analyses both conclude that higher observer coverage levels are needed and that the monitoring program is likely underestimating the amount of bycatch.

For these reasons, the Secretary must issue emergency regulations and initiate permanent rulemaking necessary to exclude midwater trawlers from groundfish closed areas not later than January 1, 2008.  Specifically, the petitioners request that the Secretary take the following related actions:

> (1) exercise his authority under 16 U.S.C. § 1855(c) to promulgate emergency regulations and interim measures  necessary to exclude midwater trawl vessels from all year round and seasonal groundfish closed areas implemented beginning in 1994 to reduce groundfish mortality and protect juvenile and spawning groundfish; and

(2) exercise his authority under 16 U.S.C. § 1855(d) to initiate rulemaking designed to make such protections permanent.

The Magnuson-Stevens Fishery Conservation and Management Act ("the Magnuson-Stevens Act" or "Act") requires the Secretary to prevent overfishing and rebuild overfished stocks. 16 U.S.C. §§ 1801 *et seq.* The Act's National Standards also require that any fishery management plan, and any regulation promulgated to implement any plan, must be based "upon the best scientific information available," and must, "to the extent practicable . . . minimize bycatch and . . . to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* § 1851(a)(2), (9). The Secretary is responsible for carrying out any fishery management plan approved by him in accordance with the Act. *Id.* § 1855(d). If he finds that an emergency or overfishing exists or if interim measures are needed to reduce overfishing within a given fishery, the Secretary is authorized to promulgate emergency regulations or interim measures to address the emergency or end the overfishing. *Id.* § 1855(c)(1).

In the Northeast Multispecies ("Groundfish") fishery, permanent and seasonal closed areas have been established beginning in 1994 in order to end overfishing and to rebuild stocks. Through these closures, groundfish fishing vessels are excluded from fishing in the closed areas in order to reduce groundfish mortality and to protect juvenile and spawning fish. *See, e.g.,* 59 Fed. Reg. 63,926, 63,928 (Dec. 12, 1994); 63 Fed. Reg. 15,326, 15,327 (Mar. 31, 1998); 64 Fed. Reg. 2601, 2601 (Jan. 15, 1999). However, rules promulgated by the Secretary allowed pelagic midwater trawl fishing vessels into the closed areas based on the assumption that midwater trawl vessels either do not catch groundfish, or catch only "negligible" amounts of groundfish. 63 Fed. Reg. 7727, 7728-29 (Feb. 17, 1998); *see also infra* Section III.[1]

---

[1] For purposes of this petition, when Petitioners refer to midwater trawl gear the intent is to refer to both single and pair trawls, with the assumption that the regulations apply equally to both fishing practices. It is not clear that

The recent NMFS Status of the U.S. Fisheries Report concludes that despite the most recent management actions predicted to end overfishing of groundfish stocks in New England, the best scientific information available shows that overfishing is currently occurring on numerous New England groundfish stocks, and that an even larger number of groundfish stocks remain overfished.  National Marine Fisheries Service, *Report on the Status of the U.S. Fisheries for 2006*, 7, 19 (June 22, 2007); *See, also infra* Section III.A.   A number of recently reported bycatch events, together with recent data from NMFS' Northeast Fishery Science Center's observer program and the recently enacted "bycatch cap" for haddock caught by midwater trawl vessels, clearly demonstrate that midwater trawl vessels catch groundfish, including significant amounts of juvenile groundfish.  *See infra* Section III. B.   Moreover, new scientific data and analysis from NMFS presented in a proposed standardized bycatch reporting methodology, together with an independent peer review of that NMFS analysis, demonstrate that the estimated amounts of bycatch in the midwater trawl fishery are likely low because there are insufficient measures in place to reliably monitor and account for the catch of groundfish by midwater trawl vessels.  *See infra* Section III.C.

The new sources of scientific information about the condition of groundfish stocks and the potential, and likely underestimated, impacts of the midwater trawl vessels on the groundfish resource demonstrate that emergency action by the Secretary to prohibit midwater trawl vessels from the groundfish closed areas is warranted.  This emergency action will reduce overfishing and promote the rebuilding of these overexploited fish stocks.

This information also demonstrates that the Secretary should make such regulatory action permanent in order to protect groundfish and to carry out his responsibilities under the

---

NMFS was contemplating pair trawling as the regulations at issue here were developed.  Therefore, this Petition is not intended to set forth a position on the legality of midwater pair trawling under some or all of these regulations.

Magnuson-Stevens Act to prevent overfishing, rebuild stocks, and otherwise implement the Northeast Multispecies fishery management plan (FMP). 16 U.S.C. § 1855(d).

## II.    STATUTORY AND REGULATORY AUTHORITY FOR THIS PETITION

The petitioners submit this petition to the Secretary of Commerce pursuant to the Administrative Procedure Act (APA), and the Magnuson-Stevens Act.

### A.    ADMINISTRATIVE PROCEDURE ACT

The APA states "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). If such petitions are denied the agency must provide "a brief statement of the grounds for denial." *Id.* § 555(e). This right "entitles the petitioning party to a response on the merits of the petition." *Fund for Animals v. Babbitt* 903 F. Supp. 96, 115-116 (D.D.C. 1995). Agencies must respond to petitions within a reasonable time, to "proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). Accordingly, the Secretary must "fully and promptly consider" all petitions presented to him. *WWHT, Inc. v. F.C.C.* 656 F.2d 807, 813 (D.C. Cir. 1981).

### B.    MAGNUSON-STEVENS ACT

The Secretary of Commerce has a responsibility to carry out any fishery management plan or amendment approved or prepared by him in accordance with the Magnuson-Stevens Act. 16 U.S.C. § 1855(d). The Secretary may promulgate such regulations, pursuant to APA rulemaking procedures, that may be necessary to carry out this responsibility or to carry out any other provisions of the Magnuson-Stevens Act. *Id.*

Additionally, the Secretary is authorized to promulgate emergency regulations or interim measures if "an emergency situation exists" or if "interim measures are needed to reduce overfishing" within a given fishery. *Id.* § 1855(c)(1). An emergency rule or an interim measure

is treated as an amendment to a fishery plan for the period it is in effect.  *Id.* § 1855(c)(3).

NMFS guidelines explain that an emergency situation in a given fishery:

> (1) Results from recent, unforeseen events or recently discovered circumstances; and
> (2) Presents serious conservation or management problems in the fishery; and
> (3) Can be addressed through emergency regulations for which the immediate benefits outweigh the value of advance notice, public comment, and deliberative consideration of the impacts on participants.  62 Fed. Reg. 44,421-44,422 (Aug. 21, 1997).

Emergency rulemaking may be initiated if notice and comment rulemaking "would result in substantial damage or loss to a living marine resource" and immediate action is necessary to "prevent overfishing" or "other serious damage to the fishery resource or habitat."  *Id.*  As set forth more completely below, the Secretary has a duty to grant this petition to protect groundfish from midwater trawl fishing under the Magnuson-Stevens Act.

## III.    THE SECRETARY HAS A DUTY TO PROTECT ADULT, JUVENILE AND SPAWNING GROUNDFISH FROM BEING CAUGHT BY MIDWATER TRAWL VESSELS IN THE GROUNDFISH CLOSED AREAS

The Magnuson-Stevens Act was enacted to prevent overfishing, rebuild overfished stocks, and establish a comprehensive fishery conservation and management scheme.  16 U.S.C. § 1801(a)-(b).  Congress intended that fishery management programs "utilize[] . . . the best scientific information available," and "consider[] the effects of fishing on immature fish and encourage[] development of practical measures that minimize bycatch and avoid unnecessary waste of fish." *Id.* § 1801(c)(3).  To that end, Congress established ten National Standards to ensure that fishery conservation and management measures meet these goals.  *Id.* § 1851(a).  For example, such measures must be based "upon the best scientific information available," and must, "to the extent practicable . . . minimize bycatch and . . . to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id*. § 1851(a)(2), (9).

The National Marine Fisheries Service through its Northeast Multispecies FMP seeks to manage nineteen different groundfish stocks.  Due to persistent overfishing and the continually

depleted status of the groundfish stocks, the New England Fishery Management Council

(NEFMC) and NMFS have designed and implemented an increasingly complex suite of

conservation and management measures over the years.  These measures are designed to limit

groundfish mortality and protect juvenile and spawning fish by reducing the fishing effort of

groundfish fishermen in the multispecies fishery.  The New England Groundfish FMP, and in

particular the 2004 amendment and 2006 framework adjustment, is intended to end overfishing,

rebuild overfished stocks, and minimize bycatch and minimize bycatch mortality where it cannot

be avoided.  *See* Amendment 13 to the Northeast Multispecies FMP, I-6, (December 18, 2003);

Framework Adjustment 42 to the Northeast Multispecies FMP, 41 (April 21, 2006); *see also*

NMFS Final Rule Northeast Multispecies Framework Adjustment 42, 71 Fed Reg 62156 (Oct.

23, 2006).

   The various measures enacted through the Groundfish FMP have resulted in negative

economic impacts on many participants in the industry.  Since 1994, a number of year-round and

seasonal closures that prevent groundfish vessels from fishing within their boundaries have

become an important management tool in the multispecies fishery.  *See* 50 C.F.R. § 648.81; *see*

*also,* Year Round and Rolling Closure Charts, (Exhibit A).  These closures were implemented to

reduce groundfish mortality, and protect juvenile and spawning groundfish.[2]

---

[2] In 1994 Closed Area I, II and the Nantucket Lightship Closed Area were implemented through emergency
rulemaking to address the stock depletion "crisis" in the multispecies fishery. 59 Fed. Reg. 63,926, 63,928 (Dec. 12,
1994).  These areas were selected because they had "historically high concentrations of various multispecies," and
NMFS determined that their closure would "help slow the decline of the stocks through a reduction in fishing
mortality." *Id.* These areas remain year-round closures today. 50 C.F.R. § 648.81. Since 1994 additional year round
and seasonal closures have been implemented to further reduce mortality and to protect spawning and juvenile
groundfish.  For example, Framework 25 to the Multispecies FMP established various area closures in several near-
coast and Gulf of Maine areas in response to reports of "record low levels" of recruitment and "declining" spawning
stock biomass of GOM cod.  63 Fed. Reg. 15,326, 15327 (Mar. 31, 1998).  In 1999 more seasonal closures were
implemented through Framework 26 to address the continually "critical" GOM cod situation as evidenced by further
declining spawning stock biomass.  64 Fed. Reg. 2601, 2601 (Jan. 15, 1999).   Note that additional closures to
protect habitat have been implemented that largely overlap with the already existing mortality and spawning
closures. 69 Fed. Reg, 22,906, 22,907 (Apr. 27, 2004).

The use of closed areas to reduce groundfish mortality and to protect spawning and juvenile groundfish has shown promise as a method for reducing overfishing of groundfish and rebuilding overfished stocks.  A recent scientific review found an increase in biomass of several species of groundfish within closed areas and in surrounding areas when they are implemented. Fogarty, Mike, *Efficacy of Fishery Closures in the Gulf of Maine*, *in* Western Gulf of Maine Closure Area Symposium, 23-25 (2007)(Exhibit B).  However, as discussed below, while the groundfish closures have resulted in significant limitations on the groundfish fishery, other fishermen not directly targeting groundfish -- such as herring midwater trawlers -- are allowed to fish in the closed areas where they catch regulated groundfish as bycatch.  *See, e.g.,* 50 C.F.R. § 648(a)(2)(iii).  This circumstance inevitably reduces the full potential of improvements in the groundfish populations that would otherwise result from the closed areas.

## A.    OVERFISHING IS OCCURING IN THE NEW ENGLAND GROUNDFISH FISHERY AND SEVERAL STOCKS ARE SEVERELY DEPLETED

In June, NMFS released its report on the status of U.S. fisheries and concluded that based on the best available scientific information the New England Groundfish FMP has not reduced groundfish mortality to levels sufficient to end overfishing and keep overfished stocks on the rebuilding trajectory established under that FMP.  *Report on the Status of the U.S. Fisheries for 2006* at 7, 19.  Many of the same groundfish stocks that suffer from overfishing struggle on the brink of collapse. *Id.* at 19; *see generally* 2005 Groundfish Assessment Review Meeting, ("2005 GARM").

While some groundfish stocks are more abundant in relative terms, none are estimated to be at the scientifically determined target biomass level necessary to produce maximum sustainable yield on a continuing basis. *Id.* at viii.  Currently, of the nineteen regulated groundfish species, eight are subject to overfishing and thirteen are classified as overfished.

*Report on the Status of the U.S. Fisheries for 2006* at 19.  The situation is dire for stocks like

Georges Bank cod and Gulf of Maine cod, which are estimated to be at only 10 and 23 percent,

respectively, of target biomass levels.  2005 GARM at 2-4, 2-156.  Biomass estimates for white

hake show that it is at less than 50 percent of its target biomass level, while the three stocks of

yellowtail flounder, along with Georges Bank winter flounder, are dismally low.  *Id.* at viii; 2-83,

2-104, 2-129, 2-327, 2-342.  Remarkably, all of these stocks continue to suffer from overfishing.

*Report on the Status of the U.S. Fisheries for 2006* at 19.  Gulf of Maine and Georges Bank

haddock continue to be considered overfished, as are American plaice, Southern New England

windowpane flounder, ocean pout, and Atlantic halibut. *Id.*

     In light of these data, NMFS must take action that will reduce overfishing and protect

spawning and juvenile fish in order to improve recruitment into New England's severely

depleted groundfish populations.

    **B.**    **MIDWATER TRAWL VESSELS CATCH GROUNDFISH, INCLUDING JUVENILE GROUNDFISH, AS BYCATCH AND ARE CONTRIBUTING TO THE OVERFISHING AND REBUILDING PROBLEMS**

     While groundfish fishermen have been excluded from closed areas in order to reduce the

mortality of adult, juvenile and spawning groundfish, midwater single and pair-trawlers that are

now known to catch groundfish are allowed to fish in the closed areas.  There they catch

groundfish and contribute to overfishing and the failure of the current groundfish FMP to

accomplish its rebuilding goals.

     The rules allowing midwater trawl vessels into the closed areas were promulgated by the

Secretary based on the assumption that midwater trawl vessels either did not catch groundfish, or

caught only "negligible" amounts of groundfish.  63 Fed. Reg. 7727, 7728 (Feb. 17, 1998).[3]  To

---

[3] At the time, NMFS justified opening the closed areas to herring midwater trawlers because of the assumption that midwater trawlers caught negligible amounts of groundfish and because the "increased reliance on closed areas for

Petitioners knowledge, however, scientifically reliable data and analysis have never been made public showing that the catch of groundfish by midwater trawlers was insignificant.  A review of Framework 18 indicates that the assumption that midwater trawl gear caught only negligible amounts of groundfish was based on review of an extremely small sample size of only six tows. *See* Framework Adjustment 18 to the Groundfish FMP, 15 (1997).   This raises serious questions about the validity of the original basis for the grant of access to closed areas.

In fact, contrary to the assumption contained in Framework 18, recent data show that midwater trawl vessels catch juvenile and adult groundfish, often in significant amounts.  For example, observer data from 46 observed midwater trawl trips in 2006 showed bycatch of haddock totaling over 18,000 pounds, redfish totaling nearly 7,000 pounds, and Pollock, cod, plaice, and flounder totaling 70 pounds.  *See* Memorandum from Lori Steele, Herring Plan Development Team Chairman, Atlantic Herring Stock/Fishery Update 15-16 (September 7, 2007)(summarizing NMFS observer program data).  Only 14 midwater trawl trips have been observed in 2007, with total observed bycatch of about 400 pounds.  *Id.* at 17-18.[4]   The analysis does not indicate whether the observed groundfish bycatch was of juvenile or adult fish.

In 2004, NMFS took enforcement action against herring midwater trawl vessels that were found illegally attempting to land thousands of pounds of juvenile haddock and hake bycatch in Maine and Massachusetts.  NOAA Fisheries Office for Law Enforcement, *Press Release: Three Fishing Vessels Penalized $85,000 for Illegal Catch* (Oct. 26, 2004) *available at* http://www.nmfs.noaa.gov/ole/news/news_NED_102604.htm (*last visited* 10/5/2007)(Exhibit C).  One of these vessels alone was estimated to have as much as 48,000 pounds of juvenile

---

multispecies mortality reduction" impeded midwater trawl fishing operations and made fishing for herring "economically less feasible." *Id.*

[4] Also reported in 2007 is the bycatch of 200 pounds of metal debris, perhaps providing some insight into why "midwater" trawl gear interacts so often with groundfish, which also primarily inhabit the bottom.

haddock on board, which can reasonably be estimated to be the equivalent of three to five times

that amount of haddock had it been allowed to grow to maturity. *See* David Hench, Fishing

industry sounds alarm over incidental catches; Two large bycatches of young haddock could be a

threat to the recovering groundfish, some say, *Portland Press Herald,* p. B1 (2004, August 21);

John Richardson, Officials back off estimating amount of dead haddock *Portland Press Herald,*

p. B3 (2004, September 21). (Exhibit C).

After these well publicized enforcement actions, the midwater trawl industry

acknowledged the fact it was catching significant amounts of groundfish as bycatch, and stated

that if, and when, groundfish populations rebuild, midwater trawls vessels will not be able to

avoid catching increasing amounts of groundfish as bycatch.  *See e.g.,* Letter from Peter Moore,

American Pelagic Association to Lori Steele, New England Fishery Management Council,

August 12, 2004 (Proposal, fn 1); see also Final Rule Implementing Framework Adjustment 43

to the Northeastern Multispecies FMP, 71 Fed. Reg. 46871, 46874 (April 16, 2006).

NMFS acted to address the now-public bycatch problem by promulgating an emergency

rule on June 13, 2005, 70 Fed. Reg. 34,055, which was later replaced by a permanent rule on

August 15, 2006. 71 Fed. Reg. 46,871.  The NMFS action was taken at the request of the

midwater trawl industry who feared additional enforcement actions because it could no longer

operate its gear without catching haddock, in particular, as the stock began to rebuild to healthier

levels.  70 Fed. Reg. at 34,055 (Midwater trawl vessels "ceased fishing for herring on [Georges

Bank] due to concern about haddock bycatch." *Id.*)

The 2005 and 2006 rulemakings implemented measures allowing midwater trawlers to

catch a specified amount of haddock as bycatch in the fishery.  71 Fed. Reg. at 46,872.  These

measures implemented a haddock bycatch cap for the midwater trawl fishery set at 0.2% of the

combined total allowable catch of Gulf of Maine and Georges Bank haddock. *Id.* It also established a new midwater trawl exempted fishery, allowing these vessels to continue to fish in the "open" groundfish areas – an action that was necessary because those vessels no longer qualified as an "exempted gear" because they were obviously capable of catching groundfish. *Id.* The new rule also established a 100 pound incidental catch allowance for all regulated multispecies other than haddock to protect the midwater trawlers when caught in possession of small amounts of other groundfish. *Id.* (Groundfish regulations in place prior to this action had prohibited the possession of haddock and other groundfish by midwater trawl vessels.) *Id.*

Significantly, these rule changes did not address the herring midwater trawl vessels' access to groundfish closed areas. The regulatory scheme established under Framework 18 had explicitly allowed midwater trawl gear access to the groundfish closed areas, and that scheme remained in place.[5]

Groundfish closed areas have been established to protect adult aggregations of groundfish as well as spawning and juvenile groundfish. New scientific analysis supports the use of this tool as a means of reducing mortality and rebuilding stocks, suggesting that when areas are closed to fishing they amass a higher population of groundfish relative to other areas. *See* Fogarty at 23-25. As discussed more thoroughly *infra* in Section IV.C., many of the groundfish spawning seasons sought to be protected by closed areas coincide with peaks in the herring fishing season. The catch of spawning fish before they have the opportunity to spawn has significantly greater impact on the overall health of the resource than the pounds reported in observer reports. Similarly, the impact of the bycatch of juvenile groundfish is understated when

---

[5] There appeared to have been some initial questions about whether the change in definition from being an exempted gear would affect the existing access to closed areas, however, substantive discussion of whether such access should or should not change did not appear to take place. Groundfish oversight committee meeting summary, 10 (May 23 2005). (*available at* http://www.nefmc.org/nemulti/pdfmeet/groundfish_may05.pdf.

measured in pounds because it accounts for only a fraction of what their adult weight would be, if allow to grow to maturity, and removes fish from the population before they have had the opportunity to spawn.

Continued access to closed areas by midwater trawl vessels which are now known to catch adult and juvenile groundfish undermines the purpose of the closures and the legal duty of the Secretary to end overfishing, rebuild overfished stocks, and minimize bycatch.  Immediate action to exclude midwater trawl vessels from closed areas will protect spawning, juvenile, and adult groundfish, thereby significantly reducing overfishing and contributing to groundfish rebuilding efforts.

C. THE MAGNITUDE AND SEVERITY OF THE IMPACT FROM MIDWATER TRAWLERS IS UNDERESTIMATED DUE TO THE EXISTING  LIMITATIONS OF THE BYCATCH MONITORING PROGRAM

A federal court reviewing the New England Groundfish FMP has observed that "there is no dispute that, given the inadequacy of other reporting methods, live observers are an essential component of an adequate bycatch reporting methodology." *Oceana v. Evans*, 2005 WL 555416 (D.D.C. March 9, 2005). The court recognized that NMFS has concluded that "[n]on-biased observer data collection in the majority of instances is the most effective way to monitor bycatch," *id.* (*citing* 68 Fed.Reg. at 11,505, 11,509) and that "[o]bservers provide the most reliable source of high quality, objective, fishery-dependent data." *Id.*  Therefore, "[f]or fisheries where observer coverage is needed to monitor bycatch... a level of coverage should be deployed that provides statistically reliable bycatch estimates." *Id.* (*citing* 68 Fed.Reg. at 11,504).

Unfortunately, the bycatch monitoring program for the midwater trawl fishery does not meet NMFS' own standards as articulated by the court.  As a result, the full impact of midwater trawl fishing in the groundfish closed areas remains unknown.   The best available science

indicates that bycatch in the herring midwater trawl fishery is likely underestimated due to existing deficiencies in the monitoring program for these vessels, including insufficient levels of observer coverage.  The level of observer coverage for herring vessels using midwater trawl gear was 16 percent in 2005, thanks in part to additional funding from Congress.  Final Amendment 1 to the Fishery Management Plan for Atlantic Herring 353 (2006) [hereinafter Amendment 1].  However, 2005 was the only year in which coverage has been over 10 percent in this fishery.  In 2004, another year in which Congress added funding for the program, less than 9 percent of trips were observed, while in prior years coverage levels did not exceed 1 percent.  *Id.* at 339.  Currently the observer coverage in the herring midwater trawl fishery is approximately 3 percent.  Personal Communication with David Potter, Fisheries Sampling Branch Chief, Northeast Fisheries Observer Program (March 5, 2007).

Existing regulations allow the Regional Administrator to consider actions limiting midwater trawl access to the closed areas if, based on sea sampling data or other credible data, she determines that the bycatch of groundfish exceeds, or is likely to exceed, 1 percent of the herring or mackerel harvested, by weight, in the fishery or by any individual fishing operation.  50 C.F.R. § 648.81(a)(2)(iii).  To put this allowance in perspective, the total allowable catch of herring alone is currently 145,000 metric tons, thus 1 percent would be the equivalent of 1450 metric tons of groundfish, or over 3 million pounds.  This allowable level of groundfish waste dwarfs the amount of groundfish caught by the groundfishermen who are members of NAMA and the MFA.  The real impact to the resource is even greater if such bycatch is of juvenile or spawning fish.

Recent scientific analysis confirms that the full impact of the midwater trawl fishery on groundfish is not known.  Moreover, the level of certainty demanded by the existing rule is

unlikely to be met in the immediate future under the existing bycatch monitoring program because of low levels of observer coverage in the fishery and flawed sampling protocols that fail to reliably account for bycatch. NMFS recently proposed a new standardized bycatch reporting methodology (SBRM) that shows there are currently insufficient levels of observer coverage on the midwater trawl fleet. Final Draft Northeast Region Standardized Bycatch Reporting Methodology, C-44 (June 2007).

An independent peer review of the proposed SBRM, by Dr. Murdoch McAllister, indicates that the gap between actual and needed observer coverage is even greater than previously believed. The review found "a number of serious flaws in the estimation method chosen to be applied in the SBRM." McAllister, Murdoch K., Review of the Northeast Region Standardized Bycatch Reporting Methodology, 4. Lenfest Ocean Program (September 2007)(Attachment D). Dr. McAllister concluded that "[b]ecause of insufficient quality control testing of the proposed SBRM, the one proposed could equally well end up prescribing unacceptably low levels of observer coverage." *id.* Further, "[t]he proposed SBRM is unlikely to provide reliable discard estimates for the vast majority of fishing mode and species combinations including groundfish and other trawl fishery discards. As such the SBRM is unlikely to provide reliable prescriptions for observer coverage." *Id.* at 6.

Dr. McAllister's review confirms that even higher levels of observer coverage are needed to produce reliable estimates of the bycatch occurring in the midwater trawl fishery than are recommended in the SBRM. Since the levels recommended in the SBRM are already significantly higher than current levels of observer coverage, it follows that existing bycatch estimates significantly underestimate bycatch in the midwater trawl fishery. This point was reflected in Dr. McAllister's comments regarding bias in the existing data that was analyzed. He

concluded that "[t]he conclusions drawn asserting that there is no evidence of bias in the observer data were inconsistent with many of the test results obtained in evaluations of the potential for there to be bias in the bycatch data obtained from observed fishing trips. In contrast, there is considerable evidence suggesting that the observer data on discards are not representative of unobserved trips." *Id.* at 5.

Making matters worse, and likely contributing to bias in the existing observer program data, are questions about the protocols used by observers while on board midwater trawl vessels. Such shortcomings in the observer program appear to contribute to the bias in the data detected in the peer review. Serious and well-known deficiencies exist in sampling methods that would lead to underestimation of the amount of bycatch of groundfish occurring in closed areas. For example, there is unobserved catch even on observed trips, occasionally in large amounts and/or high frequencies. This is comprised of the catch left in the net after pumping operations conclude, or sometimes before they even begin; that catch is discarded with no examination. This practice is known as "dumping bags" or "slippage," and there is no estimation of what or how much is dumped or the level of mortality. A second example of unobserved catch in these fisheries results from a pumping operation out of midwater trawl nets, through one or more sorting grates prior to entering the fish-hold and before any examination by observers. These sorting grates, the first of which is usually on the pump nozzle and is called the "seal guard," shunt off larger unwanted bycatch so that it stays in the cod-end from which it is later dumped unobserved. Larger groundfish would remain in the net unobserved when such a grate is used.

In summary, the recently proposed SBRM, peer review, and sampling protocol weaknesses demonstrate that, the shortcomings of the existing bycatch monitoring and reporting system ensure that the amount of groundfish caught by midwater trawl gear in the groundfish

closed areas is underestimated.

* * *

All of these factors support action to exclude midwater trawl vessels from the groundfish closed areas.[6]  As discussed further below, the Secretary should take immediate action to exclude midwater trawl vessels from the groundfish closed areas in order to reduce overfishing in the groundfish fishery and protect juvenile and spawning groundfish.  The Secretary should also initiate rulemaking to make such changes permanent, at least until such time as it is scientifically established that midwater trawl vessels do not catch groundfish, or closed areas are no longer necessary to end overfishing and rebuild depleted groundfish stocks.

## IV.    THE RECENT SCIENTIFIC INFORMATION WARRANTS IMMEDIATE ACTION BY THE SECRETARY TO EXCLUDE MIDWATER TRAWLERS FROM GROUNDFISH CLOSED AREAS IN ORDER TO REDUCE OVERFISHING AND PROTECT OVERFISHED GROUNDFISH

Emergency action to exclude midwater trawlers from groundfish closed areas is warranted in order to reduce overfishing occurring on New England's already depleted groundfish populations and prevent serious damage to the groundfish resource.  Under the Magnuson-Stevens Act and existing regulations, the Secretary may issue emergency regulations or establish interim measures to address an emergency or overfishing.  16 U.S.C. § 1855(c)(1).  Existing regulations define emergency situations as those resulting from recent, unforeseen events or recently discovered circumstances and that present a serious conservation or

---

[6] Exclusion of midwater trawl gear would also advance NMFS efforts to meet the Magnuson-Stevens Act requirement to minimize the mortality of bycatch.  Harvest of herring in closed areas by purse seine gear would continue and, as discussed during deliberations on Amendment 1, bycatch by such gear is less likely to result in mortality than is bycatch in trawl gear.  Existing observer data also indicate that purse seines catch fewer groundfish as bycatch than do trawls.  Amendment 1 at 96-97 (*finding, e.g.,* that "[w]hile the majority of observed bycatch by midwater trawls (single and paired) is still herring and dogfish, the number of species caught as bycatch and the overall bycatch amount (lbs.) is higher than by purse seines. The proposed restriction [on midwater trawling in the inshore Gulf of Maine during the summer] could therefore indirectly benefit recovering groundfish stocks in the inshore Gulf of Maine.")

management problems in the fishery that can be addressed through emergency regulations, for

which the immediate benefits outweigh the more deliberative consideration. 62 Fed. Reg. at

44,422.  Emergency rulemaking may be initiated if notice and comment rulemaking "would

result in substantial damage or loss to a living marine resource" and immediate action is

necessary to "prevent overfishing" or "other serious damage to the fishery resource or habitat."

*Id.*

The discussion above sets out the elements necessary to satisfy the regulatory test for

emergency action by the Secretary.  Therefore these elements simply will be summarized here.

### A. The Continued Overfishing of Groundfish and the Impacts of Herring Midwater Trawlers in Closed Areas on Juvenile and Spawning Groundfish Stocks are Recent Unforeseen Events and Newly Discovered Circumstances

As noted above, new scientific data and information have recently come to light

establishing that an emergency situation exists that requires action by the Secretary to exclude

midwater trawl vessels from groundfish closed areas in New England.  First, the June report on

the status of U.S. fisheries confirms that overfishing is occurring on several New England

groundfish stocks and that several groundfish stocks remain depleted – despite management

actions taken in the Groundfish FMP that were predicted to solve these problems.   A 2007

scientific review of the existing closed areas in New England shows that they hold significant

promise for rebuilding depleted groundfish stocks.  However, this promise is undermined by the

mounting evidence that, contrary to prior assumptions, midwater trawl vessels catch juvenile and

adult groundfish, sometimes in significant amounts.  Finally, new analysis by NFMS of its

bycatch monitoring program, together with an independent peer review of that analysis, shows

that the bycatch problem is likely much more severe than currently estimated and significant

improvements are needed to establish a scientifically sound bycatch monitoring program.

**B.     The Continued Presence of Midwater Trawlers in Groundfish Closed Areas Presents Serious Conservation and Management Problems in the Groundfish Fishery.**

As discussed above, groundfish closed areas were first established in response to the groundfish crisis of the mid-1990s and are intended to reduce groundfish mortality and protect spawning and juvenile groundfish stocks for several severely depleted species.  Because these areas are closed to fishing by groundfishermen, they have a high population of groundfish relative to other areas, and thus hold a lot of value, as they are critical to the recovery of depleted stocks.  *See* Fogarty at 23-25; *see also, e.g.,* GARM 2005 at 2-5 (noting that the lack of strong recruitment for Georges Bank cod suggests that recovery of the stock is largely dependent on (i) reducing fishing mortality in the near term and (ii) husbanding recent strong year classes to increase spawning stock biomass).

Continuing to allow midwater trawl vessels into the New England groundfish closed areas at this time -- when it is now understood that such vessels catch juvenile and adult groundfish -- poses a serious threat to the future of the resource.  Well publicized enforcement actions have demonstrated that midwater trawl vessels are capable of catching thousands of pounds of juvenile groundfish in single fishing trips, and the existing observer program shows that groundfish continue to be caught in the fishery.  Moreover, the fact that NMFS does not currently have the bycatch monitoring program in place to responsibly monitor the impacts from the midwater trawl vessels amplifies the threat such trawling presents to the groundfish resource.  Allowing midwater trawl vessels to fish in critical groundfish closed areas with insufficient accountability mechanisms in place is a serious conservation problem that must be addressed by the Secretary.

C.    **The Benefits of Immediate Action Outweigh the Need for Advance Notice, Public Comment and Deliberative Consideration of the Impacts of the Emergency Action Through Normal Rulemaking.**

All of the factors discussed above support action to exclude midwater trawl vessels from the groundfish closed areas in New England.  The NEFMC and NMFS have clearly indicated, however, that the next management action that could potentially address the midwater trawl closed area access issue is not scheduled to take place until May of 2009, at the earliest.  Given that the herring fishing year begins on January 1 each year, this suggests that the harm to groundfish stocks from midwater trawlers' access to groundfish closed areas is likely to continue for up to two years or even longer unless emergency and permanent action is taken by the Secretary.

In this case, the benefit of immediate action outweighs the need for the normal public comment procedures because the threat to juvenile and spawning groundfish from midwater trawlers threatens the recovery of the resource and the fishing future for groundfish fishermen. The Atlantic herring fishing year begins on January 1 and the peak months for the herring fishery are January through February, and June through December. *See* New England Fishery Management Council, Atlantic Herring Stock Assessment and Fisher Evaluation Report, 1, 14, (2004).  These peaks overlap with the spawning seasons of several of the groundfish stocks that are subject to overfishing and/or are overfished. For example, the spawning season for cod varies depending on the temperature of the water, but ranges from the end of November to the end of April. *See* Henry B. Bigelow & William C. Schroeder, Fishes in the Gulf of Maine 194 (2002). For haddock the spawning season lasts from January through August.  *Id.* at 238.  The spawning season for yellowtail flounder begins in April and lasts through the summer months, *id.* at 275 while the spawning season for winter flounder begins in January and lasts through May. *Id.* at 280.  Immediate action needs to be taken before the start of the next herring season to ensure that

the spawning groundfish stocks are protected, and to ensure that we do not waste more of New England's precious spawning groundfish.

Moreover, the NEFMC, groundfishermen, and the public have all spoken clearly on this issue since 1994, with the consistent premise for allowing midwater trawlers into the closures being that midwater trawlers catch negligible amounts of groundfish. The information now available to the agency no longer supports this premise and suggests that the catch of adult and juvenile groundfish by midwater trawl vessels in closed areas stands as a significant threat to one of the nation's critical fishery resources.

Finally, the requested emergency action would produce a fair result because it would treat fishermen using gear capable of catching significant amounts of groundfish equally; neither groundfishermen nor midwater trawl fishermen will be allowed to access the closed areas. For all of these reasons, the benefits of emergency action to exclude midwater trawl vessels from the groundfish closed areas outweigh the benefits of more deliberative consideration of this issue. The Secretary must use his Magnuson-Stevens Act authority to act now to exclude midwater trawlers from closed areas, consistent with the Act's conservation and management requirements and the New England Groundfish FMP.

## CONCLUSION

Recent scientific information shows that immediate action by the Secretary to exclude midwater trawl vessels from groundfish closed areas is warranted in order to reduce the overfishing of groundfish and rebuild depleted groundfish populations. The June 2007 NMFS Status of the Stocks Report shows that the changes to the groundfish management plan over the past several years have not ended overfishing on 8 of 19 groundfish stocks, and that 13 stocks remain overfished. Meanwhile, mounting evidence shows that contrary to the assumptions made

when midwater trawlers were allowed into closed areas, such vessels catch adult and juvenile groundfish, at times in significant amounts. The concern over the amount of groundfish bycatch that is actually occurring is amplified by the bycatch program analysis released this summer by NMFS, which shows that current observer coverage levels are insufficient to provide reliable bycatch estimates. An independent peer review of that analysis concludes that the picture is likely significantly worse than the NMFS analysis indicates, and that even with the higher observer coverage levels recommended in NMFS' analysis the bycatch monitoring program would likely underestimate the amount of bycatch occurring in the fishery.

For these reasons, the Secretary must issue emergency regulations and initiate permanent rulemaking necessary to exclude midwater trawlers from New England groundfish closed areas not later than January 1, 2008.

Respectfully Submitted,

Roger Fleming, Earthjustice
1042 Peabody Road
Appleton, Maine 04862
Phone: (978) 846-0612
Email: RFleming@Earthjustice.org
Fax: (207) 785.2231

Attorney for Petitioners

# EXHIBITS

**A.  Northeast Multispecies Year Round and Rolling Closure Charts**

**B.  Mike Fogarty, Efficacy of Fishery Closures in the Gulf of Maine (2007)**

**C.  NOAA Fisheries Office for Law Enforcement, *Press Release: Three Fishing Vessels Penalized $85,000 for Illegal Catch* (Oct. 26, 2004);**

**C-2. David Hench, Fishing industry sounds alarm over incidental catches; Two large bycatches of young haddock could be a threat to the recovering groundfish, some say, *Portland Press Herald,* (2004, August 21);**

**C-3. John Richardson, Officials back off estimating amount of dead haddock *Portland Press Herald,* (2004, September 21).**

**D.  McAllister, Murdoch K., Review of the Northeast Region Standardized Bycatch Reporting Methodology, Lenfest Ocean Program (September 2007).**

Exhibit A

## Northeast Multispecies Year Round Closed Areas
(50 C.F.R. 648.81)



Source:  NOAA Fisheries

# Northeast Multispecies Rolling and Seasonal Closures
(50 C.F.R. 648.81(f)(g))



Source: NOAA Fisheries

# Efficacy of Fishery Closures in the Gulf of Maine

Exhibit B

*Mike Fogarty, Fisheries Biologist, NOAA Fisheries Northeast Fisheries Science Center*

Mike Fogarty presented an overview of the complexity of the closures in the Gulf of Maine and evidence for biomass increases, larval protection and other benefits to the ecosystem that closures have provided. The closures discussed were Closed Area I, located on Western Georges Bank; Closed Area II, located on Southeastern Georges Bank; and the WGOMCA.

Fishery closures are primary management tools used to manage New England groundfish stocks. Almost all of the GOM is subject to closure at some point during the year due to both rolling and year-round closures. Year-round closures currently cover 22,000 $km^2$ of seafloor.

### Within-closure Effects

There has been a tremendous increase in the biomass of sea scallops on Georges Bank since closures were adopted there in 1995. In general, sedentary finfish species have seen greater rebounds in closed areas compared to more mobile fish, such as cod, which may only be present in the closed area for short periods of time. Species that ex-



*Within-closure effects on sea scallop density.*

*23*

hibit intermediate movement patterns benefit from closures but also provide a benefit to the fishery by migrating out of closures.

## Closure Spill-over Effects

Open areas adjacent to closed areas have also experienced increases in fish abundance, due to the spill-over effect. Many fishermen experience economic benefits by "fishing the line." Catch rates of haddock



*Haddock catch rates along a Georges Bank closure boundary.*

Haddock catch rates
= 0
= 0.1-50 kg
= 50.1-100 kg
= 100.1-250 kg
= 250.1-500 kg
= 500.1-1765 kg

and yellowtail and winter flounder are much higher along closure boundaries (e.g., adjacent to Closed Area I) than farther from closures due to spill-over. However, this is not the case for hake.

A model study on larval export showed that for both self-seeding and cross-seeding animals, larvae released in Closed Area I seeded areas



*Sea scallop distribution along Georges Bank.*

outside of the closed area. However, adults in Closed Area II only tended to seed the closed area.

*24*

**Other Ecosystem Considerations**

The WGOMCA closed an area of high species diversity and fishing effort, displacing many fishermen.  However, the abundance and biomass of fish has increased dramatically in closed areas and has correlated with a reduction in fish mortality. Maps of species diversity showing the species affected by trawling will be used to decide where to have future closed areas to protect biodiversity.

The recovery of gravel habitat epifauna is evident in photographs from 1994, 1995, 1996, 1997 and 1999. Also, the benthic mega-fauna has grown dramatically in undisturbed areas such as Georges Bank Closed Area II. In a comparison of shallow sites versus deep water sites, the benthic megafauna had a much greater increase in the undisturbed deep water sites than the shallow sites. Overall, undis-turbed sites have a higher produc-tion of benthic megafauna.



*These photos show habitat diversity in 1994 compared to 1999.*



NOAA Fisheries
Office for Law Enforcement

Office Home  |  Northeast  |  Southeast  |  Alaska  |  Northwest  |  Southwest  |  Pacific Islands

NOAA Fisheries
Office for Law Enforcement

Exhibit C

FOR IMMEDIATE RELEASE
October 26, 2004

CONTACT:

      Mark Oswell
      (301) 427-2300
      Charles Juliand
      (978) 281-9379

### THREE FISHING VESSELS PENALIZED $85,000 FOR ILLEGAL CATCH

The National Oceanic and Atmospheric Administration (NOAA) issued Notices of Violation and Assessment (NOVA), with penalties ranging between $10,000 and $50,000 to three fishing vessels (FVs), for violations of the Magnuson-Stevens Fishery Conservation and Management Act (MSFCMA). The NOVAs issued on October 12, 2004 cited each vessel for landing and possessing northeast multispecies in violation of federal fisheries regulations promulgated under the MSFCMA. NOAA is an agency of the Department of Commerce.

On or about Aug. 10, 2004, Law Enforcement Officers from the Maine Marine Patrol boarded a commercial fishing boat and found unlawfully landed and possessed northeast multispecies caught by means of pair trawling near Rockland, Maine. NOAA issued a $50,000 NOVA to the owner.

On or about Aug. 10, 2004, officers from the NOAA Fisheries Office for Law Enforcement and the Maine Marine Patrol boarded a commercial fishing boat in Portland, Maine. They found unlawfully landed and possessed northeast multispecies harvested by mid-water trawl gear in violation of the vessel's mid-water trawl exemption certificate. NOAA issued a $25,000 NOVA to the owner and operator of the boat.

On or about July 16 and 17, 2004, personnel from the NOAA Fisheries Office for Law Enforcement, Massachusetts Environmental Police and US Coast Guard boarded a commercial fishing boat and found unlawfully landed and possessed northeast multispecies caught by means of pair trawling near Gloucester, MA. NOAA issued a $10,000 NOVA to the owner and operator.

While fishing for herring, these vessels unlawfully landed and possessed various amounts of northeast multispecies, including haddock and hake. Herring vessels are prohibited from possessing and landing any amount of northeast multispecies.

"Because these cases were being so closely watched by both the herring and groundfish industries, we asked NOAA General Counsel to expedite their review of our investigations," said Special Agent-in-Charge Andy Cohen, Office for Law Enforcement – Northeast Division.

NOAA Fisheries is dedicated to protecting and preserving our nation's living marine resources through scientific research, management, law enforcement, and the conservation of marine mammals and other protected marine species and their habitat.

The Commerce Department's National Oceanic and Atmospheric Administration (NOAA) is dedicated to enhancing economic security and national safety through the predication and research of weather and climate-related events and providing environmental stewardship of our nation's coastal and marine resources.

Home | About Us | Forms | Privacy Policy | Information Quality | Disclaimer | Contact Us | Feedback | Search




Exhibit C - 2

DAVID HENCH, Fishing industry sounds alarm over incidental catches ; Two large bycatches of young haddock could be a threat to the recovering groundfish, some say, *Portland Press Herald* B1 (2004, August 21).

"The groundfish industry has sacrificed and some have been put out of business. To see four-inch haddock caught and thrown away with six-cents a pound herring, it's a slap in the face." Peter Baker, spokesman for Cape Cod fishermen's group

Maine authorities found roughly 48,000 pounds of juvenile haddock mixed in with the herring catch from two boats last week - a violation of federal law and a threat, some say, to future groundfishing.

The discovery of so many haddock that have yet to reach maturity has some fishermen worried that large herring trawlers are hurting efforts to rebuild groundfish stocks, even though the herring boats aren't supposed to be fishing at the depths where groundfish live.

"The groundfish industry has sacrificed and some have been put out of business. To see four-inch haddock caught and thrown away with six-cents-a-pound herring, it's a slap in the face," said Peter Baker, spokesman for a Cape Cod fishermen's organization. Mature haddock typically sells for about $1.50 a pound, he said.

Baker was attending a meeting in Portland of a panel reviewing herring regulations. Maine Marine Patrol officers and federal enforcement officials had hoped to report on the discovery of the haddock and alert processors and others to the problem, but they were told the meeting's agenda was full.

Depletion of fish stocks over the years has led to a succession of austere restrictions on the groundfish industry. Restrictions on where, when and how fishermen operate are intended to give the stocks a chance to rebound, for more lucrative harvests in the future.

The plan is working, especially for haddock. Officials say the stocks of juvenile haddock are at record levels and fishermen should expect a

banner year once the "baby boom" matures.

 "We've got the largest size year-class that's ever been recorded in haddock," said Paul Howard, executive director of the New England Fisheries Management Council. "The council wants to husband that so it reaches full benefit for the fishery, which is in 2006. If we don't husband that, the fishermen who have been sacrificing in the groundfish fleet won't be able to benefit from this large year- class."

 That's why the discovery of so-called **bycatch**, the incidental catch of non-target species, with the herring is potentially troubling. On Aug. 10, Maine Marine Patrol boarded two herring boats and found that of 1.1 million pounds of fish, about 4.5 percent was undersize haddock, according to the New England Fisheries Management Council.

 Demand for herring has grown and the techniques for harvesting the fish have become more sophisticated. Herring is used as bait in lobster traps, but increasingly, the small fish also is being processed as food for people.

 The Gulf of Maine herring fishing fleet has been criticized in the past for depleting an important food source for other species such as tuna, cod and whales.

 Modern herring boats can run in pairs, pulling huge nets stretched between them. The net is pulled through the midwater column, that is, not along the ocean bottom. The practice should lead to relatively little **bycatch** of groundfish, which typically stay near the bottom.

 Critics say the herring trawlers pull up groundfish because they fish too deep, seeking herring that have settled low in the water.

 But a herring industry association says the two landings of herring mixed with haddock are an anomaly, the result of small haddock schooling higher in the water column on Georges' Banks.

 They said the problem first appeared in late June when haddock was documented in a herring catch landed in Gloucester, Mass.

 "Haddock, generally considered bottom dwellers, at certain life stages can school and move up in the water column.," said a statement from the herring industry group East Coast Pelagic Association. "However, intermixing with . . . herring stocks is an experience that fishermen have not had in the past." Historically, herring fishermen have not landed

significant amounts of groundfish, the association said.

 Federal law prohibits the herring fishing boats from landing haddock, and its presence with a catch can lead to stiff penalties for a captain and vessel owner.

 Last week's enforcement action against two herring boats is under investigation by federal authorities, in part to determine the severity of the problem.

 "We really don't know what's happening. Is this is a problem or just an incident?" said Col. Joe Fessenden, head of the Maine Marine Patrol, which enforces federal fishing laws in Maine waters. "We also found a number of boats landing legal product."

 In the meantime, the Maine Marine Patrol has stepped up its boarding of herring boats.

 Hank Soule, executive director of the Portland Fish Exchange, said the presence of haddock in a couple of herring landings is not in itself a threat to groundfishing.

 "If we were to see that recurring day after day, boat after boat, I would be concerned," he said.

 But he believes the young haddock population is strong enough to withstand such pressures. "I'm not as worried about this one-time event as some other fishermen are."

 Staff Writer David Hench can be contacted at 791-6327 or at: dhench@pressherald.com

Exhibit C - 3

JOHN RICHARDSON Officials back off estimating amount of dead haddock *Portland Press Herald,* p. B3 (2004, September 21).

Regulators caught in the middle of a fishing-industry feud are backing away from estimates that two Maine herring trawlers accidentally killed 48,000 pounds of young haddock during a fishing trip last month.

 The actual amount of haddock can't be known for certain, according to NOAA Fisheries, which had more recently placed the number at about 30,000 pounds.

 "In the end, after reflection of a couple of weeks, people said we probably shouldn't put a pound number on it," said Teri Frady, NOAA Fisheries' chief of research communications in the Northeast region.

 Any possession of haddock by a herring trawler is a federal violation, but the estimates in the Maine case were so large that they triggered angry charges and countercharges within the New England fishing industry, and put pressure on federal regulators to take action, without taking sides.

 Maine Marine Patrol officers found the haddock when they examined the catches of a trawler that docked in Rockland and another that docked in Portland.

 A random sample taken from one boat contained 4 1/2 percent juvenile haddock, and the sample from the second boat contained 2 percent. If the entire catches inside the boats had the same rate of "**bycatch**," the two vessels would have contained about 31,000 pounds of haddock. Initial calculations had put the estimate as high as 48,000 pounds.

 Federal scientists now concede the samples - 1,200 pounds from each boat - were not large enough for accurate estimates, according to Frady.

 Col. Joseph Fessenden, the head of the Maine Marine Patrol, agreed there is no way to be sure about the total amount of haddock in the catches, which have already been distributed by bait dealers. But, he said, the numbers were clearly large. "You're not supposed to have any."

Frady said NOAA officials are still considering penalties in the case.
 Staff Writer John Richardson can be contacted at 791-6324 or at: jrichardson@pressherald.com



Exhibit D

# Review of the
# NORTHEAST REGION STANDARDIZED BYCATCH REPORTING METHODOLOGY

By

**Murdoch K. McAllister, PhD**

Associate Professor in Fisheries Assessment and Statistics

Fisheries Centre, University of British Columbia

AERL, 2202 Main Mall, Vancouver, B.C. V6T 1Z4

SEPTEMBER 2007

A report supported by the



**Preamble**

This report is a peer review of the scientific basis for the Northeast Region Standardized Bycatch Reporting Methodology (SBRM) (NMFS 2007).  NOAA and the New England Fishery Management Council released a document outlining a SBRM in June 2006 that was revised in response to earlier public comment.  NOAA has requested comment on it by September 24th.  So far there appears to have been no independent scientific review of the SBRM.  The chief goal of my report is to provide a review of the scientific basis in the SBRM report.  The terms of reference for my review are provided below.

**Terms of reference:**

➢ Conduct a review of the National Marine Fisheries Service's proposed Standardized Bycatch Reporting Methodology to determine whether the methods will result in observer coverage levels that can be extrapolated to provide statistically significant catch and bycatch information to fisheries managers.   The review should address the following points and consider the questions below:

  o Is the observer and other data used to calculate the recommended observer coverage levels for each fishery robust enough to be the foundation of this program?

  o Is the SBRM's treatment of the accuracy issue valid or are there ways to improve the analysis now or with additional data over time?

  o Is the filtering process scientifically sound?

➢ An independent scientific paper that either confirms the analysis and recommended levels of observer coverage contained in the SBRM or points out where it falls short and how it would need to be improved in order result in scientifically sound recommendations for observer coverage levels.  This review should include a discussion of specific high profile fisheries, including:

  o NE Groundfish- discard mortality of groundfish in the fishery;

  o NE/Mid-Atlantic Scallops- sea turtle and yellowtail flounder discards;

  o NE Mid-water Trawl- bycatch of fish and protected species;

  o Mid-Atlantic Trawl – bycatch of sea turtles in trawl nets

**Some additional questions for the Reviewer to consider:**

1)  Will the Standardized Bycatch Reporting Methodology program described and analyzed in the EA provide estimates of bycatch with the expected precision (CV=30%)?

2)  Will the SBRM provide discard and mortality information which can be used to monitor, enforce and regulate a fishery that is governed by Annual Catch Limits/Hard TAC's that are required under the recently reauthorized MSA?

3)  Does this reporting methodology account for rare bycatch events such as protected species?

4) Will the proposed methodology be sufficient to account for the change in fishing behavior caused by a fisheries observer (the observer effect)?

5) Is the apparent reliance on vessel trip reports, which are notoriously inaccurate, scientifically valid?

**Executive Summary**

The goal of the Standardized Bycatch Reporting Methodology (NMFS 2007) is to design a methodology that can be applied to all commercial and protected species in the Northeast region to estimate bycatch. My general conclusion is that I have serious reservations about the apparent low degree of scientific rigor in the determination of the SBRM.

First, the SBRM report describes the fisheries sampling programs currently in place that provide data on bycatch obtained by the large number of different fishing fleets in the Northeast Region. It evaluates the potential merits, limitations, and evidence for potential bias in the bycatch data obtained in the observer program. The observer data is identified as the most reliable dataset with which to estimate bycatch and the authors use this data as the foundation for the Methodology. The SBRM report concludes that this is appropriate because the available evidence strongly supports the hypothesis that any bias in the observer data is negligible. However, many of the key conclusions reached are inconsistent with the reported results. Considerable evidence of differences between observer data and FVTR data, FVTR data and dealer records, the spatial distribution of observed and unobserved trips suggest potential for bias in the FVTR and observer datasets. Yet the majority of the results suggesting potential bias are overlooked or explained away as unimportant. Despite the large amount of evidence suggesting systematic differences in records between observed and unobserved trips and between FVTR data and dealer data, the SBRM report concludes that if there is bias, it is negligible and that these data can be used as if they are unbiased.

Secondly, the SBRM describes six alternative statistical methods to estimate bycatch for each protected species and commercial species and species group from the observer records of bycatch. Some of these methods also use the FVTR estimates of total kept biomass for a given fishing gear type and region to expand the observer estimates to a similar scale. The SBRM report analyses the assumptions in each of the statistical methods and compares the estimates of bycatch provided by each of the methods against each other. The report concludes that the best bycatch estimation method is the combined ratio method, which uses the ratio of bycatch to kept biomass per trip from the observer database and multiplies it by the FVTR estimate of total discards kept to obtain the total bycatch per fishing gear type (fishing mode) and species. However, the key assumptions of the preferred statistical method do not hold in the vast majority of datasets shown in the report. This leaves open the possibility for there to be serious bias in the estimates provided. Additionally, the results showed that one of the statistical methods not chosen for application, the simple expansion method, provided bycatch estimates more precise than those given the preferred method. This simpler method could be expected to be more robust to the common lack of a linear relationship between discard and kept biomass observations and high frequency of zero discard observations. My conclusion is thus that the SBRM makes an inferior choice for the statistical method. This may seriously compromise the reliability of observer coverage recommendations and the reliability of discard estimates that will be provided from the currently proposed SBRM.

The methodology used to prescribe the necessary observer coverage for a given fishing gear type in a given region is largely "math-driven". Based on the target level of precision of 30%, the formulae for precision in the bycatch estimate and the existing data on discards and kept biomass, the number of observed trips can be calculated directly. This is done for each species

3

for which there is sufficient data. Where no such data exist, either a prescription for observer coverage is computed using an ad hoc rule to create a pilot survey with a fixed small percentage of the coverage already present for a given gear and region. The recommended amount of observer coverage for a given fishing fleet in a given region is set at the largest amount of coverage necessary to give a CV of no more than 30% in the bycatch estimate for each species. Some filters are applied to prevent highly impossible and highly unlikely gear-species combinations (e.g., baleen whales in crab pots) from dominating the determination of observer coverage for each given gear type. Other filters are applied to prevent species that have very low bycatch in a given gear type or contribute a very tiny amount to known fishing mortality from dominating the determination of observer coverage.

It is common to simulate datasets with the observed properties in the data obtained and apply a newly proposed estimation method to these simulated data to see whether it gives acceptably precise and accurate results. This was not done in this report. In my view statistical estimation methods such as the ones proposed in the SBRM should be simulation evaluated with simulated test data and found to have acceptably low bias (the average value for the estimates obtained is acceptably close to the true value) and acceptably high precision (the amount of variability in the estimates obtained is acceptably low). Additionally, the reliability of the prescriptions for sampling coverage would also need to be evaluated with simulated data. It is only methods that are found to perform acceptably after thorough simulation testing that could be proposed as candidates for the SBRM. This has not been done, and the current SBRM should not be accepted for implementation until this has been carried out with an acceptable degree of rigor.

<u>My main conclusions and their implications for the acceptability of the SBRM are listed below:</u>

1. I found a number of serious flaws in the estimation method chosen to be applied in the SBRM. This is serious because the resulting recommendations for observer coverage that could be obtained from the proposed SBRM could potentially lead to excessive wastage of government funds because unnecessarily high numbers of observer days could potentially be specified by the SBRM. Because of insufficient quality control testing of the proposed SBRM, the one proposed could equally well end up prescribing unacceptably low levels of observer coverage. The SBRM should have but did not provide sufficient assurances that the bycatch estimates obtained could be expected to have sufficiently high accuracy and meet the target level of precision. For example, without having applied conventional protocols for quality control testing of the proposed methods, it remains possible that point estimates of biomass could still vary wildly from year to year, despite the current SBRM's assurances that this variability will be acceptably low.

2. The SBRM failed to adequately evaluate the statistical properties of the six different bycatch estimation methods proposed in the report. The SBRM report's evaluations of whether the key assumptions of the statistical method chosen for the SBRM held showed that these assumptions did not hold for the vast majority of instances in which this method is to be applied. Yet, these violations in both key assumptions were ignored in the decision to choose this estimator for bycatch estimation and the calculation of the number of observer days required. Furthermore, comparisons between the precision in the bycatch estimate provided by each method showed one other method had higher precision than the chosen method in the majority of the instances shown in the report. Thus, the SBRM appears to have chosen a statistical method with inferior

precision and in which the key assumptions do not hold for the vast majority of combinations of fishing gears, regions and species where it is to be applied. It has done this despite the well-established principle that applying a statistical method to data for which the method's assumptions do not hold and severe violations of assumptions are extensively apparent can result in severe bias in the estimates obtained.

3.  The two key assumptions of the chosen statistical method, i.e., the "combined ratio method", which applies the ratio of discards to kept biomass from observed fishing trips were not met in the vast majority of fishing method – species combinations shown in the SBRM report and in most instances, there appear to be marked violations of these assumptions.  Failure to have these assumptions met could result in serious bias in bycatch estimates in the vast majority of fishing method – species combinations, bias in the estimates of precision in the bycatch estimates, and specifications for observer coverage that may in practice fail to meet the target levels of precision in future estimates of discards.

4.  One of the proposed estimation methods that was not chosen, the simple expansion method (which does not use any ratios e.g., of discards to kept biomass), gave for the majority instances shown lower CVs in bycatch estimates than the other methods.  This method also does not suffer the same lack of robustness to the nonlinearity and high proportion of zeros in the discard data as do the ratio estimation methods.  This method could potentially serve as a candidate bycatch estimator before further study reveals estimators more suitable to the available data.  A key problem that should have been acknowledged in the SBRM is that the available evidence suggests that there may be bias in the discard estimates obtained from observed trips.  But at present, the amount of bias in the observer estimates of discards is unknown and impossible to accurately assess.

5.  It is surprising that no simulation evaluations were conducted to evaluate the potential reliability of the proposed bycatch estimation methods, as this is standard protocol in quality control testing of proposed new statistical methods, and has been applied for decades in fisheries stock assessment.  It is recommended that simulation testing of the bycatch estimation methods (i.e., estimators) should be carried out to evaluate the potential bias and precision in the candidate estimators of bycatch.  Only those methods found to perform acceptably should be considered for implementation.

6.  I could find nothing seriously wrong with the filtering methods adopted in the SBRM.  These appeared to be scientifically sound and could be expected to reduce considerably the amount of observer effort without compromising the quality of data required for bycatch estimation.

7.  The conclusions drawn asserting that there is no evidence of bias in the observer data were inconsistent with many of the test results obtained in evaluations of the potential for there to be bias in the bycatch data obtained from observed fishing trips.  In contrast, there is considerable evidence suggesting that the observer data on discards are not representative of unobserved trips.  However, it is not possible with the information available to quantify the direction or magnitude of the potential biases in the observer estimates of discards.

8.  The conclusions drawn asserting that the Fishing Vessel Trip Report (FVTR) provide accurate estimates of kept biomass were inconsistent with many of the results obtained in evaluations of the potential for there to be bias in the FVTR records of kept biomass of various species by the different fishing methods.  In contrast there is considerable evidence in the SBRM report that the FVTR estimates of landings may be biased.  Yet this information has not been

applied in the development of the SBRM and could introduce bias in bycatch estimates obtained from the SBRM.

9.  The proposed SBRM is unlikely to provide reliable discard estimates for the vast majority of fishing mode and species combinations including groundfish and other trawl fishery discards and protected species such as sea turtles.  As such the SBRM is unlikely to provide reliable prescriptions for observer coverage.  This is largely due to the serious violations in assumptions of the chosen ratio bycatch estimator.  The violations of assumptions are caused largely by the high fraction of zeros in the data (i.e., rare event phenomena) and the requirement of the ratio estimator for the data to be adequately described by a linear model that goes through the origin.

**Introductory Remarks**

The proposed SBRM (NMFS 2007) identifies observed fishing trips as the source of data with which to estimate bycatch and formulate an approach to estimate the bycatch of various species and species groups in various fishing modes. Various analyses are carried out and other various information are reviewed to evaluate the potential for there to be sampling bias in the observer data, i.e., to evaluate whether the observer program could deviate from representative or random sampling of the total population of fishing trips and behaviours in each of the fishing modes and give estimates of bycatch systematically different from actual bycatch amounts. Based on these analyses the SBRM report concludes that there is strong evidence to support the hypothesis that the observer program provides data representative of the total population of fishing trips by fishing mode. My comparison of the evidence provided from these evaluations suggests that the evidence is not quite so strong and details are discussed further below.

The proposed SBRM aims to identify annually levels of observer coverage to estimate bycatch of various species and species groups in various fishing "modes" which characterize fisheries with particular gears, species and regional focus. The SBRM applies a conventional statistical approach to identify the observer coverage in the various fishing modes that could potentially yield bycatch estimates for the species of interest at the target level of precision. For example, well known conventional ratio estimators are identified for the estimation of bycatch of various species in each of the identified fishing models. Taylor series expansion is applied to formulate equations for the standard error in the bycatch estimates that could be obtained from the proposed ratio estimators. These equations are rearranged so that observer coverage for a particular fish and species combination can be computed based on data in the previous year.

Where data missing in particular cells, a data imputation methodology is formulated and applied. The formulation of observer coverage is also subject to a variety of constraints and filters to take into account practical considerations such as whether particular species are at all likely to become bycatch in a particular fishery. Thus, it appears a standard / conventional statistical approach has been taken to identify desired levels of observer coverage from historical data.

In my view, however, the report shows relatively low standards of practice and/or serious omissions in its (1) identification of candidate bycatch estimators, (2) evaluation of their potential accuracy and bias in estimating bycatch, (3) identification of estimators of standard error in the bycatch estimates obtained, (4) evaluation of the accuracy and precision of the estimators of standard error, and (5) evaluation of overall potential reliability and the potential degree of interannual stability in the proposed estimators of annual bycatch, standard error and methods to identify annually the observer coverage by fishing mode. Below, I elaborate on these and other concerns I have about some apparently low standards of scientific rigor in some aspects of the proposed SBRM. I evaluate the questions outlined in the terms of reference of my review but due to the very large amount of material to review was unable to address with equal amounts of detailed analysis all of the terms of reference. I have however provided a very thorough and detailed evaluation of the adequacy of the key scientific and statistical components of the SBRM. I include in the report some recommendations for additional analyses that could be carried out to more adequately and rigorously evaluate the potential quality and usefulness of key components of the proposed SBRM.

**Part 1: Conduct a review of the National Marine Fisheries Service's proposed Standardized Bycatch Reporting Methodology to determine whether the methods will result in observer coverage levels that can be extrapolated to provide statistically significant catch and bycatch information to fisheries managers.**

## IS THE OBSERVER AND OTHER DATA USED TO CALCULATE THE RECOMMENDED OBSERVER COVERAGE LEVELS FOR EACH FISHERY ROBUST ENOUGH TO BE THE FOUNDATION OF THIS PROGRAM?

The robustness of data used in the standardized bycatch reporting methodology can be evaluated in a number of different ways. One important question concerns whether the set of observed trips is representative of unobserved trips. If observed trips are not representative of trips that are not observed, the estimates of bycatch, effort and catch kept can be different from the true values for those items. The SBRM report describes a number of tests that were applied to evaluate whether there might be sampling bias in the available observer data when comparing it to the FVTR data and VMS data.

FVTR data are used to characterize the fishing effort of each fishing mode and some of these modes do not yield this information because they operate mostly in state waters. However, this is a small proportion of the identified set of modes. The vast majority of fishing modes have complete or near complete coverage with the federally mandated FVTRs.

In my view the sampling program proposed for obtaining bycatch estimates has a few issues regarding accuracy but largely appears to be the best available sampling program for bycatch estimation. Some tests were applied to evaluate the potential for bias in bycatch estimates from this sampling program and some of the results seem to indicate that the observer program appears in many of the fishing modes to provide a representative sample of the trips in those modes. However, it appears that some of the results suggesting non-representative sampling in some modes were glossed over and I disagree that taken together the results of these tests provide strong evidence that the observer program will offer unbiased data for bycatch estimation.

## I. EVALUATION OF BIAS IN OBSERVER DATA, TRIP REPORTS, AND LANDINGS DATA.

### A. Tests for differences in biomass kept and trip length between observed and unobserved trips.

Plots of observer estimates versus unobserved estimates of average kept biomass per trip for 14 different species groups are provided in Appendix B, Fig. B-7. If these are to be perfectly comparable, then we should not be able to reject the null hypothesis that the slope equals 1. However, no results of such hypothesis tests were reported. The best estimate regression line and the 68% ellipse were plotted on each graph.

On p. 145 of the main report it is stated:

*"Based on analysis that compared available FVTR data from unobserved vessels with data recorded by observers, average catches (kept pounds) by species groups for observed and total trips compare favorably (Appendix B, Figure B-7) and followed an expected linear relationship."*

I don't have a file copy of the datasets. However, by inspecting the graphs, it appeared that in three of the 12 species groups reported where there were sufficient data, the apparent slopes

departed substantially from the one to one line and if tests had been performed I suspect that the null hypothesis that the slope equals 1 would be rejected (see Table 1 below).

Table 1.  Comments on plots of observer and FVTR estimates of kept biomass per trip for various species groups in Figures B-7 and B-8 and B-9.  The values in columns two and three should be the same if there were to be no bias at all.

| | Average Kept (lb) | | Histograms of VTR-Observer values for average kept | | Comments |
|---|---|---|---|---|---|
| | Observer | VTR | Difference in Average Value | Difference in the SDs | |
| Atlantic Bluefish | 200 | 2000 | Right tailed | Right tailed | quite different, likely to be significant difference |
| Fluke-Scup-Black Sea Bass | 1000 | 2000 | Left-tailed | Right tailed | quite different, though might not be significant difference |
| Spiny Dogfish | 400 | 700 | Symmetric | Symmetric | quite different, though might not be significant difference |
| NE Multispecies - Large-mesh | 2000 | 1500 | Left-tailed | Symmetric | quite different, though might not be significant difference |
| NE Multispecies - small-mesh | 1000 | 5500 | Right-tailed | Right tailed | very different, likely significant |
| Monkfish | 1000 | 1000 | Left-tailed | Left-tailed | very similar, not significant |
| Atlantic Herring | 50000 | 50000 | Symmetric | Symmetric | very similar, not significant |
| Red crab | insufficient data | | | | |
| Mackerel/Squid/Butterfish | 200000 | 150000 | Right-tailed | Right-tailed | quite different, though might not be significant difference |
| Surf Clam – Ocean Quahog | insufficient data | | | | |
| Sea Scallop | 50000 | 50000 | Symmetric | Right-tailed | very similar, not significant |
| Skate complex | 500 | 700 | Left-tailed? | Left-tailed? | similar, not likely to be significant |
| Tilefish | 1000 | 5000 | Right-tailed | Right-tailed | very different, likely significant |
| All species | 200000 | 160000 | Symmetric | Right tailed? | quite different but not likely to be significant |

Similarly, histograms of the differences in the average kept biomass per trip between FVTR and observer data were plotted in Figure B-8 and differences in the SDs are shown in Figure B-9.

The following is stated on p. 145 and 146:

*"If the observed and unobserved trips within a stratum measure the same underlying fishing processes, one would expect not to detect a significant statistical difference in the average catches (and the standard deviations) between the FVTR and observer datasets. An examination of the distribution of these differences (Appendix B, Figures B-8 and B-9), by species group, indicates no evidence of systematic bias and general symmetry in the pattern of positive and negative differences".*

Apart from the general claim of "symmetry" in the histograms shown for differences between the FVTR and observer records and for differences in their SDs, the report does not indicate what aspects of the visual inspection lead its authors to conclude no evidence of systematic bias. There are a number of aspects of the histograms that could be inspected visually to look for bias. One is to see whether the position of the mode (highest point of the frequency distribution) lines up with zero. Another is whether the tails on either side of the mode appear to be symmetric (mirror image tails on either side of the mode) or asymmetric (the length/ thickness of the tails are noticeably different on either side of the mode). While most of the plots show modal values at zero difference, in many of the plots for differences in average values (Figure B-8) and differences in the SDs (Figure B-9), the tails appear to be asymmetric suggesting possible systematic differences in kept biomass between observed and unobserved trips for many of the species groups (see Table 1 above).

It should be noted that the report does not indicate what order of difference in kept biomass would be of concern. For example, would a bias of the order of 5% or more in kept biomass be of concern? Without an objective quantitative basis to judge whether an apparent difference is of concern, the evaluation of potential bias applied in the report appears to be rather arbitrary. To provide a more objective basis to evaluate potential for bias in the observer data, statistical tests would need to be carried out, for example, to test the null hypothesis that the means and SDs from these two sources do not differ. These were carried out (see below for my comments on these). Tests could also be applied to evaluate skewness of the distributions of differences, but this was not done.

The results of hypothesis tests for the differences in kept biomass by species group between observed and unobserved trips are shown in report table 56. It is stated on p. 145 of the Report:

*"The average difference in catch, by species, between the observed and unobserved trips was generally small as a proportion of total catch, and the average catch rates between the two datasets were not significantly different from zero in 12 of the 14 comparisons (Table 56)."*

The report concludes on p. 145:

*"These results suggest that average catch rates on observed trips were not significantly different from average catch rates reported on FVTRs, indicating no evidence of bias in the observer data based on the measure of average catch rate."*

Even if there were differences found, in the average kept biomass of a given species type per trip, it is unclear whether this difference reflected a real difference in the kept biomass between observed and unobserved trips, or just reflected some bias in reporting between observed and unobserved trips when there really was no difference. This latter hypothesis seems to be a possibility given the large fraction (2/3) of species groups for which percent differences between FVTR and dealer based landings ranged between -10% and -40%, suggesting possible under reporting of landings in FVTR data.

11

### i.  The report incorrectly uses these results to support the position that observed trips provide unbiased information about unobserved trips.

In my view, the report incorrectly uses these results to support the position that observed trips provide unbiased information about unobserved trips.  Firstly, the report misstates the case for there being no statistical difference.  In Table 56, there were 11 out of 14 (not 12 out of 14) comparisons that were not significantly different from zero.  Secondly, significance at a rate of three out of fourteen cases (21%) is higher than expected from the alpha error rate of 5%, i.e., higher than expected by chance variation alone if there really was no difference.  Thirdly, using only null test results (i.e., failures to reject null hypotheses) to assert that no differences exist does not follow conventional statistical hypothesis testing protocol.  Null results cannot be used to assert that no difference exists without also showing that the statistical power of the tests was acceptably high (Toft and Shea 1983; Peterman 1992).  It is commonplace to require that statistical power be computed when no significant differences are found and when it is of interest to accept the null hypothesis that there is no difference.  Fourthly, no data on average kept biomass in VTR vs. Obs. trips were shown to support claim that the differences were a small proportion of average catch.  Given these various shortcomings, the report fails to meet conventional peer review standards in arriving at its conclusions that there was no evidence to indicate bias issues in the observer data.

### ii.   The reported statistical values do not match the stated conclusions.

Two other sets of results suggest differences between in the data collected from observed and unobserved trips.  Firstly, a paired t-test of the stratum-specific standard deviations (SDs) of pounds kept showed significant differences in six of the 14 comparisons (i.e., 43% of the species groups tested showed differences in the SD in the pounds kept between observed and unobserved trips).  Secondly, it was found that the difference in SDs between observed and unobserved trip length was significantly different.  This single hypothesis test was performed for all 14 species groups in aggregate.  In contrast hypothesis tests for differences in the average kept biomass per trip (and also the SD in kept biomass per trip) between observed and unobserved trips was performed separately for 14 different species groupings.  It is not explained why the tests for difference in mean trip length and differences in SD in trip length were performed for all species (and all fishing mode types) in aggregate only.  The evaluation for potential bias would have been better informed if the tests for differences in mean trip length and SD in trip length between observed and unobserved trips had been performed on a species grouping basis, or perhaps, even more appropriately, a fishing fleet mode basis, rather than lumping data from all fishing fleet types together in one single test.

The difference in mean trip length was found to be not significant at a p-value of 0.167 and it is concluded on p. 146 that:

*"The results also suggest that average trip durations were similar between the observed trips and the FVTR trips, indicating no evidence of bias in the observer data based on the measure of average trip length."*
This conclusion is inadequately supported since statistical power was not computed to indicate the chance of correctly detecting a difference if it existed (Toft and Shea 1983; Peterman 1990).  As mentioned above, it would have been also more informative if statistical tests were carried out for each of the main fishing modes rather than doing a single test with data across all fishing modes lumped together in a single test.  Indeed, it could potentially be found that when tests are

12

done for single fishing modes, that significant differences could be found at this level but due to some modes having positive differences and others negative differences, a single test all modes could show no significant difference in average trip length across all fishing modes.

      iii.     Similarities in kept biomass, trip length and landings data are not representative of bycatch data

Also, while patterns in biomass kept per trip and trip length might be similar between observed and FVTR trips, this does not guarantee that discarded biomass and species composition will also be similar between observed and unobserved trips. Thus, a finding of similarity in landings indicates only indirect suggestive evidence about the key variable, discards, and the potential for there to be differences in discards between observed and unobserved trips.

The general conclusion from these analyses stated on p. 146 is:

*"Overall, these results indicate that observer trips are generally similar to FVTR trips and there are no bias issues evident." (p. 146.)*
This conclusion is made despite 21% of the tests showing significant differences in the mean values for kept biomass per trip between observed and unobserved trips, 43% of the tests showing significant differences in the SDs for kept biomass per trip between observed and unobserved trips, and a significant difference in the SD in trip length between observed and unobserved trips. Only one of the four sets of tests, i.e., for a difference in mean trip length showed no significant difference. In none of the instances were no significant difference was obtained was statistical power computed. Yet the set of negative test results obtained was used to assert that "there are no bias issues evident". The report does not explain why significant differences in the kept biomass per trip, SDs in kept biomass per trip, and SDs in mean trip length do not present bias issues in the observer data. Further tests for individual fishing modes could have been carried out to evaluate differences in the average trip length and SD in trip length per fishing mode.

### B. Tests for differences in the spatial distribution of observed and unobserved trips

    i. <u>The conclusion that there is a strong coherence in spatial distribution between observed and unobserved trips is incongruent with the test results.</u>

Testing for differences in spatial distribution between observed and unobserved trips could also provide indications of bias in the observer data on discards. The occurrence of discards in fishing trips is highly likely to have strong spatial dependency, and any significant differences found in the spatial distribution of fishing effort between observed and unobserved trips could be taken to indicate the potential for there to be bias in observer trip data on discards. Appropriately, there was some testing for such differences reported.

 On  p. 146. it is stated:

*"Two measures of spatial coherence were also examined. Within stratum h (fleet  and quarter) the expected number of observer trips by statistical area j (Ejh) as the product  of the proportion of FVTR trips in statistical area j and stratum h (Vjh) and the number of observed trips in stratum nh. Thus, Ejh= Vjh * nh. These expectations can then be compared to the actual*

*frequencies (Ojh) of observed trips by statistical area. Results of these analyses indicate that the spatial distribution of fishing effort for trips with observers on board closely matches the spatial distribution of trips for the stratum as a whole (Table 57). It was possible to compute chi-square statistics for 86 strata. The null hypothesis of observer proportions equal to FVTR proportions was rejected (P<0.05) in 38 of the 86 comparisons, which suggests that there are some spatial differences in the observed data compared with the FVTR data. This analysis included data collected on trips used for training observers, as well as quota-monitoring trips which have disproportionate higher rate of observer coverage than other observed trips, and this may explain the significant differences observed for otter fleets."*

It is concluded on p. 147.

*"Overall, these comparisons suggested strong coherency between these two independent measures of fishing locations; therefore, there is no evidence of bias in the observer data."*
This conclusion is incongruent with the test results and there is also inaccuracy in the reporting of spatial test results. Firstly, the text on p. 146 inaccurately reports the test results in Table 57. In Table 57, <u>48 out of 86</u> comparisons (not "38 out of the 86 comparisons" as reported in the text on p. 146) show significant differences at the alpha level of 0.05. Secondly, rather than only 44% as suggested in the text, 55% of all of the tests carried out showed significant differences in the spatial distribution of fishing effort between observed and unobserved trips. This is far higher than could be expected from the specified alpha error rate of 5% if there really were no differences and would appear to provide strong evidence of differences in the spatial distribution of fishing effort between observed and unobserved trips. In contrast, it would appear perverse to suggest that finding only 44% (38/86) of all tests showing significant differences provides evidence of strong coherency in fishing location between observations.

<u>ii.  The report's conclusion that "there is no evidence for bias in the observer data" is inconsistent with the many results showing potential for there to be bias.</u>

While the report carries out tests for differences in the spatial distribution of fishing effort and thus provides an apparently objective basis with which to judge whether evidence of for bias exists, the report deviates from conventional standards in the use of evidence from statistical tests to evaluate the plausibility of alternative hypotheses. Typically, rejections of the null hypothesis at a rate greater than the accepted alpha level should provide evidence against the null hypothesis. However, the authors or the report clearly do not apply this convention. The authors do not justify why they deviate from this convention in their judgment and do not indicate or justify the exceptionally high rate of rejection of the null hypothesis that must occur before the authors might concede that may be bias.

Thus a key question for the authors is what standard of evidence would they deem appropriate for the making of conclusions regarding the coherency in fishing locations between observed and unobserved trips? Indeed, what rejection rate would have lead to the authors of the report to conclude that there is evidence of bias in the observer data, a rejection rate of 55% (the rate actually obtained), 80%, 100% of all tests performed? As indicated above convention would have it that a rejection rate of more than the specified alpha rate of 5% would suggest that differences exist and require also that findings of no statistical difference be accompanied by statistical power calculations. With the apparent pronounced deviation from standard scientific conventions for the use of evidence, it appears unlikely that the report's conclusions would be

14

changed if it had instead correctly assessed 48/ 86 rejections of the null hypothesis of no difference. The report's conclusion that "there is no evidence for bias in the observer data" is thus inconsistent with the many results showing potential for there to be bias and in my view is inadequately justified.

>       iii. Trips aboard boats using Vessel Monitoring Systems can not be categorized
>       as unobserved trips.

Other previous evaluations are also referred to and used as evidence to support the viewpoint that there is no evidence to suggest differences in spatial coverage between observed and unobserved trips. For example on p. 146 it is stated:

*"A paper by Murawski et al. (2005 in press) presents information on the spatial distribution of otter trawl fishing effort for vessels with Vessel Monitoring Systems (VMS) with the distribution of tows on observed trips. Qualitatively, the spatial distributions match very well with high concentrations of effort near the boundaries of the existing closed areas on Georges Bank and within the Gulf of Maine. Moreover, the effort concentration profiles deduced from VMS data coincided almost exactly with the profiles derived from observed trips."*

While this analysis appears to provide support for the hypothesis of no difference in spatial coverage between observed and unobserved trips, the VMS trips are another form of "observed" trip since the vessel operators may have been influenced by the knowledge that a VMS is on board their vessel. VMS trips, thus, are not exactly a fair representation of unobserved trips. One could therefore expect the VMS observed trips to show similarities with actual observed trips, and not necessarily correctly represent the behaviours of completely unobserved trips. The apparent similarity in spatial distribution of effort between VMS and observer trips is thus not very surprising.

>       iv. The question of *whether* bias exists in the observer data is a moot point.

It is most likely that some bias exists in some form or another in the observer data when compared to the unobserved trip data. The key questions should be rather as follows: (1) For each component of the data to be applied, what is the direction and magnitude of the bias in the observer data? (2) How much bias is tolerable for data to be used as is without any correction in the SBRM? e.g., is 1% tolerable, 5% tolerable, 10% tolerable? (3) If the assessed bias is judged to be in excess of the levels of tolerance for any one component of the data, what should be done about it? (a) What measures if any should be taken to correct the assessed bias in the data and/or estimators applied that utilized the biased data? (b) What measures if any should be taken to modify existing sampling programs to reduce to a tolerable level the biases in data obtained from the existing sampling program?

## C. Tests for differences in landings data and between FVTR data and Dealer Records.

The FVTR data are used to define the "sampling frame" for the estimation of total bycatch by fishing mode and species and species group. In other words, the estimates of total kept biomass by each fishing mode for each species or species group, and estimates of total days at sea by

fishing mode from the FVTR data are used to expand the ratio estimates of bycatch to total bycatch. This requires that the FVTR estimates of landings by species and days at sea are acceptably accurate. The report compares FVTR data on landings by species and species group with dealer records of landings. The use of the dealer landings records as an unbiased benchmark appears to be reasonable because "[a]ll federally permitted dealers are required to report 100 percent of their purchases" (p. 122). It is stated also on p. 122 that " These data are generally considered to represent a near complete census of total landings".

The report also asserts on p. 122 the following:

*"The validity of using the FVTR data as a basis for developing a sampling frame is supported by comparisons with total landings data from dealer records. ... A comparison of species landings from FVTR and dealer records for calendar year 2004 reveals some discrepancies, by species group, between these two sources (see Table 37). Overall, there is a 2.3 percent difference between landings reported in the dealer and FVTR databases; however, this low percentage difference is driven in part by a -10 percent difference for herring. If herring landings are removed from the total, the difference between the total kept weight in the two databases is 4.7 percent."*

While the report admits that there are "some discrepancies", it appears here also that the report dismisses results that suggest potential bias in the data used in its SBRM.

Some explanations are given for the differences found, for example, on p. 123:

*"Large percentage differences for bluefish and spiny dogfish may be due to an inability to partition out the mandatory reporting landings (reflective of the FVTR data) from the state landings data, but this issue is unique to 2004 when mandatory electronic reporting for dealers was first implemented."*

It is concluded on p. 123:

*"total landings of bluefish and spiny dogfish represent a small fraction of the total landings of all species and, overall, these differences are considered negligible."*

The report emphasizes the small percent difference when landings are summed across species as part of the support of its conclusion that differences between the FVTR and dealer landings are negligible. In contrast, the SBRM aims to provide discard estimates by species and species group in a given fishing mode and for the bycatch to kept biomass ratios, the estimates of kept biomass for a given fishing mode are crucial to the total bycatch estimates and the prescriptions for observer coverage. In this light, estimates of the percent difference in landings aggregated across species groups can be misleading, i.e., particularly for assessing the potential differences in landings between the FVTR and dealer landings data at levels that are irrelevant to the SBRM. Thus, contrary to the information emphasized in the SBRM report, the most important differences to focus on are the differences at the species and species group level. While it might have been more appropriate to make comparisons between the FVTR data and the dealer landings data at the fishing mode level, the report points out that the Dealer landings data cannot

16

be disaggregated to the fishing mode level since information on fishing mode is not a part of the Dealer landings dataset.

The SBRM report also claims that for some of the instances where the percent difference is quite large, e.g., for spiny dogfish and bluefish, that these results are unimportant in the bigger picture since these landings represent a small fraction of the total landings. However, it should be kept in mind that the estimates of kept biomass per fishing mode from the FVTR data are to be used as expansion factors for estimated bycatch ratios. Thus, even if a FVTR landing estimate for a particular species is small compared to the total landings, the bycatch estimate obtained could still be substantial if the estimate of the bycatch ratio happens to be relatively high. A 30 or 40% bias in estimated landings for a given species group in the FVTR data could potentially propagate to a 30 or 40% bias in the estimated bycatch of a fishing mode that happens to catch mainly this species group. Thus, discounting some of the instances of large percentage differences because they represent a small fraction of landings may be misleading and inappropriately dismissive of important evidence.

Generally, stock assessment biases with magnitudes (absolute values) larger than 5 or 10% are considered to be of concern (e.g., Punt 1993; McAllister 1998). Here, the 8 out of 12 of the reported percent differences were larger in magnitude than 10%, ranging between 10.3% and 39.9% (see Table reproduced below). Because dealer landings could be considered to be unbiased estimates of landings, the percent difference in landings between FVTR and Dealer reported landings could be considered to represent the percent bias in the FVTR data. The average absolute percentage bias across all 12 species groups is 15.2%. Thus would indicate that on a species group basis, the average absolute bias could be expected to be in the order of 15%, which would in the field of stock assessment science would be considered to be non-negligible.

Table 2. Reproduction of Table 27 in the SBRM Final Report. The sign on the values for difference and percentage difference have been corrected and cells shaded with yellow indicate differences larger than 10%. Note also that Table 27 incorrectly reports the sign of the differences and percentage differences between the FVTR and Dealer landings by species group.

| | Landings (mt live) | | | |
| | FVTR | Dealer | Difference | Percent difference |
|---|---|---|---|---|
| Atlantic Bluefish | 2,357 | 3,423 | -1,066 | -31.1 |
| Atlantic Herring | 94,223 | 85,456 | 8,767 | 10.3 |
| Deep-Sea Red Crab | 1,733 | 2,041 | -308 | -15.1 |
| Mackerel/Squid/Butterfish | 97,400 | 97,083 | 317 | 0.3 |
| Monkfish | 14,643 | 21,185 | -6,542 | -30.9 |
| Large-mesh multispecies | 35,101 | 41,414 | -6,313 | -15.2 |
| Small-mesh multispecies | 8,883 | 9,277 | -394 | -4.2 |
| Sea Scallop | 242,550 | 243,736 | -1,186 | -0.5 |
| Skate complex | 13,054 | 16,073 | -3,019 | -18.8 |
| Spiny Dogfish | 600 | 983 | -383 | -39.0 |
| Summer Flounder/Scup/Black Sea Bass | 11,732 | 13,887 | -2,155 | -15.5 |

17

| Tilefish | 1,229 | 1,216 | 13 | 1.1 |

A simple t-test with the landings data log transformed to test for differences in the mean of the log transformed landings between FVTR and Dealer sources (i.e., whether the mean ratio of landings between these two sources deviates from 1), leads to a rejection of the null hypothesis of no difference with a p-value of 0.012. A 95% confidence interval for the mean ratio of FVTR landings to Dealer landings by species group lies between 0.77 and 0.96 with the mean ratio being 0.87 indicating that on average, FVTR data under-estimate actual landings. Note that this result concerns the mean value for the ratio across species groups. The estimates SD in the ratio across species groups is 0.15 thus indicating quite a bit of variability among species groups in the potential bias in landings estimates from the FVTR data. However, the result indicates that, unless bias corrections are applied, use of the FVTR data as bycatch ratio expansion factors will tend to lead to under-estimates of bycatch.

Thus, a perhaps more careful inspection of the comparisons between FVTR and Dealer records of landings by species groups would lead to conclusions other than those obtained in the SBRM report, e.g., on p. 122"

*"The validity of using the FVTR data as a basis for developing a sampling frame is supported by comparisons with total landings data from dealer records."*

In contrast, the results reported in Table 37 and further analyses of these results suggest that for the majority of species groups, substantial biases exist in the FVTR estimates of landings by species group. If these FVTR data are applied without correction, it is conceivable that biases in estimates of discard with magnitudes up to about 40% could potentially result and biases of similar magnitude in the prescriptions for observer coverage could also propagate, since the bycatch estimates and FVTR kept biomass estimates are also used in computing CVs in bycatch estimates and the CVs in bycatch estimates are used in estimating the desired amount of observer coverage. It is stated on p. 124 that:

*"The above comparisons of dealer and FVTR-based landings estimates suggest that some of the expansion factors for estimating total discards, and the weighting factors for d/k ratios will be underestimated slightly."*

However, the conclusion that where they may occur, underestimates will be slight is inconsistent with the fairly substantial apparent biases in the FVTR estimates of landings.

While comparisons of FVTR and Dealer estimates of landings are presumably applied to evaluate whether bias exists in the FVTR data and it is acknowledged that some differences between the FVTR and dealer estimates of landings were found, the report down-weights findings of differences in its conclusions. It is worrying that apparently conventional standards for judging bias were not followed and in their place no explicit criteria were offered with which to objectively apply the findings in arriving at a conclusion over whether bias exists in the FVTR data. Thus, conventional standards used in stock assessment were set aside, and considerably more extreme standards of evidence appear to have been applied. By conventional standards for example, it would appear to be perverse to conclude that overall, the differences in landings between FVTR and dealer records are negligible when in two thirds of the comparisons made, biases of magnitudes larger than 10% and up to 40% were found. A key question thus for the

18

authors of the report is what standard of proof would they require to lead to the conclusion that there is evidence of bias in the FVTR data? 80% of the results showing absolute differences larger than 10%, 100% of the results showing absolute differences larger than 10%, 50% of the results showing absolute differences larger than 50%? 50% of the results showing absolute differences larger than 100%?

Again, it appears to be a moot point, whether bias is present in the FVTR landings estimates. More important questions are as follows: 1) How large is the magnitude of the potential bias in the FVTR data for each species grouping (bias by fishing mode cannot be assessed due to information on fishing mode not being included in the dealer landings data)? 2) What is the direction of the bias for each species grouping? 3) What level of assessed bias should be considered sufficiently high to require some action to be taken to attempt to reduce the effects of the bias in the SBRM? 4) What particular measures, if any, should be taken to reduce the effects of assessed bias in the FVTR data on bycatch estimates, standard error in bycatch estimates, and prescriptions for observer coverage?

Accepting that some of the FVTR estimates of landings may be biased, one corrective measure that could potentially be taken is to utilize the dealer landings data to estimate the potential bias in the FVTR landings data by species and species group and if at all possible, region and/or fishing mode. A bias-correction factor could then be applied to the FVTR estimates of landings to attempt to correct for the bias in these data. It is however problematic that the dealers landings data base does not include sufficient detail on fishing mode. This could mean that the bias correction factors obtained from the dealer landings and FVTR landings comparisons might not precisely apply to a particular fishing mode. The bias in the FVTR data on landings for a given fishing mode could be expected to deviate from the average bias found in the mode – aggregated comparisons between the FVTR and dealer landings data. It is likely however that applying a bias correction factor and the species / species group level across modes to the FVTR estimates of kept biomass for a given fishing mode could reduce the bias in discard estimates. As suggested below, the potential reductions in bias from such a bias correction approach should really be evaluated through Monte Carlo simulation of simulated data with known specifications that mimic as best as possible the properties of the existing data.

### D. Summary points on the robustness of data used in the SBRM

1) The observer data on bycatch appear to be the best available data on bycatch by species and fishing fleet type. No other data exist with the extent of coverage of bycatch species, landed species and fishing mode. As to the robustness of the observer data with regards to bycatch estimation, the fraction of combinations of species and species groups by fishing mode by quarter that have coverage too low to permit estimation of bycatch, is relatively small. There appears to be sufficient data in the vast majority of species-fishing mode-quarter cells to permit the computation of a bycatch value and standard error in the estimate. No other type of data collected comes close to providing the high level of coverage offered by the existing observer dataset.

2) A non-unsubstantial fraction of the estimates of bycatch already provided gave precision within the target level of a CV of 30%, indicating that the existing observer database has potential to provide bycatch estimates with the desired level of precision. For example it is stated on p. 143-4:

*"For the 28 fishing modes for which a CV could be estimated, 19 (68 percent) had CVs less than or equal to 30 percent for all species combined (Table 44 and Table 45)....Looking at the non-gray cells for which there was observer coverage, the majority (58 percent) had either no discards or CVs of 30 percent or less. By definition, those cells that had either no discards or CVs less than 30 percent were of sufficient quality to meet the performance standard proposed to be implemented through this amendment."*

3) There are some potential robustness issues concerning whether observed trips are representative of unobserved trips. The various empirical tests for potential differences reveal significant differences in the average landings per trip, SD in landings per trip, SD in trip length, and spatial coverage between observed and unobserved trips.

4) There are also some potential robustness issues about potential biases in the biomass kept expansion factors obtained from the FVTR data with about two thirds of the comparisons showing magnitudes of bias between 10 and 40%.

## IS THE SBRM'S TREATMENT OF THE ACCURACY ISSUE VALID OR ARE THERE WAYS TO IMPROVE THE ANALYSIS NOW OR WITH ADDITIONAL DATA OVER TIME?

There are two dimensions to the accuracy issue in the SBRM, as adroitly pointed out in SBRM report and Appendix A. For example on p. 117 of the report it is stated:

*"There are generally two primary potential sources of bias in a sampling program such as the at-sea observer program: Non-representative sampling; and the statistical properties of the consistency of the estimators (Rago et al. 2005). Non-representative sampling means that the targets of the sampling program (i.e., the vessels and trips on which an observer is present) are distinct and different from the overall population for which an estimate is desired. For example, if observers were placed only on small vessels fishing just offshore using a single gear type, these trips would not be representative of the variety of vessels, fishing gears, trip lengths, and fishing locations that comprise the wider fleet. The following section addresses the many ways in which the NEFOP strives to ensure that the observer program samples (observes) the Northeast Region fishing fleets in a representative manner. Later sections of this chapter address the statistical properties of the estimators, and provide evidence that there is very little bias associated with the data collected by the at-sea observers."*

In the next section I comment further on the issue of how the SBRM deals with the issue of potential bias from non-representative sampling. In the following section, I comment on the issue of how the SBRM deals with the issue of potential bias from "the properties of the consistency of estimators".

## I. ADDRESSING ACCURACY IN DATA, I.E., ARE THE DATA OBTAINED AND APPLIED REPRESENTATIVE?

There are at least two key potential sources of bias resulting from possible non-representative sampling in the SBRM report. One is in terms of the potential bias in the FVTR estimates of the sample frame. A second is in terms of the potential bias in estimates of bycatch from observed fishing trips. In the previous section, I addressed the issue of whether the SBRM's treatment of

20

the accuracy issue is valid for the first two sources of bias.  In both cases, my answer is no.  I do not agree with the viewpoint on p. 117 stating the evidence reviewed suggests "that there is very little bias associated with the data collected by the at-sea observers".  Where tests revealed potential bias in the observer and FVTR data, these results were downplayed.  Some analyses suggesting no difference were inappropriately used to support the hypothesis of no bias, for example, the use of null results in significance tests for potential differences without accompanying statistical power tests, the use of percent differences in results aggregated across species and species groups, when what really matters is at the species group level.  There's also the use of results from studies that show no difference when in fact the supposed control group is inappropriately identified, e.g., the assumption that VMS trips provide unbiased representations of observed trips.

Despite a large amount of evidence obtained suggesting potential bias in the FVTR and observer data, the SBRM report asserted that there was no evidence to suggest bias and that any differences obtained were negligible.  I do not believe these conclusions of negligible bias are adequately justified given the many different results suggesting bias.  As I've indicated above, I believe the SBRM would be better served by accepting that bias is likely to exist in various components of the FVTR and observer data and to formulate protocols to reduce as much as possible the impacts of the assessed bias in the FVTR and observer data.

Some possible ways to improve the analysis now include the following:

(1) As stated above, the dealer landings data could be utilized to estimate the potential bias in the FVTR landings data by species and species group and, if at all possible, region and/or fishing mode.  A bias-correction factor could then be applied to the FVTR estimates of landings to attempt to correct for the bias in these data.  It is however problematic that the dealers landings data base does not include sufficient detail on fishing mode.  This could mean that the bias correction factors obtained from the dealer landings and FVTR landings comparisons might not precisely apply to a particular fishing mode.  The bias in the FVTR data on landings for a given fishing mode could be expected to deviate from the average bias found in the mode –aggregated comparisons between the FVTR and dealer landings data.  It is likely however that applying a bias correction factor and the species / species group level across modes to the FVTR estimates of kept biomass for a given fishing mode could reduce the bias in discard estimates.  As suggested below, the potential reductions in bias from such a bias correction approach should really be evaluated through Monte Carlo simulation of simulated data with known specifications that mimic as best as possible the properties of the existing data.

2) While differences were found in the average landings per trip, the SD in landings per trip, and the length of the trip between observed and unobserved trips, this does not pertain directly to the key variable utilized in the observer database, the discarded amount of a given species or species group per trip.  Thus, a mean difference in the landings per trip between observed and unobserved vessels for a given fishing mode and species type, does not necessarily imply that the same percentage bias will occur for the discards between observed and unobserved trips.  The same goes for any differences found in the SD in the landings per trip between observed and unobserved trips.  That differences are found in the landings data, indicates however that there is potential for there to be differences in the bycatch.

3) One correction factor could potentially be applied to the observer data estimates of kept biomass of a given species type in observed trips.  If there was some quantitatively assessed bias

in the kept biomass per trip for a given species in a given fishing mode, a bias correction factor could be derived for the observer based estimates of kept species per trip. However, there appears to be no objective or reliable basis to estimate the potential bias in kept biomass in observed trips, because the standard against which the bias would be assessed, the FVTR data, could themselves be biased, as suggested above.

4) For the longer term, if the dealer landings records could for each landings obtained also record the fishing mode, as defined in this SBRM, this could provide a far more accurate set of data, i.e., the dealer landings data, on kept biomass per fishing mode, than the FVTR data. This could lead to the use of more reliable, more accurate expansion factors for bycatch estimation and more accurate estimates of bycatch and the observer coverage needed.


## II. ADDRESSING POTENTIAL BIAS FROM THE STATISTICAL PROPERTIES OF THE CONSISTENCY OF THE ESTIMATORS

The SBRM report correctly identifies bias from the statistical properties of the consistency of the estimators as one potential source of bias in bycatch estimates. However, my overall impression is that the report did not take appropriate and sufficient measures to evaluate this form of bias in the estimators proposed in the report. This section reviews the six bycatch estimation methods formulated and the SBRM report's analysis of the properties of the estimators that lead to a choice of the best estimator. Various analyses in Chapter 5 of the SBRM report were intended to assess the potential for bias in the estimators and to compare the precision in bycatch estimates offered by the estimators. The steps taken achieve this included evaluating how well assumptions of the methods were met, and comparing the standard errors and CVs (SE divided by the estimate) in estimates provided by the estimators, and to compare the estimates provided by the different estimators. The inspection of assumptions is standard practice and is necessary to evaluate the potential for bias since bias typically arises when model assumptions are not met. For example, when X-Y data show a strongly curved relationship, and a linear model is applied, the linear model will produce biased results.

Six alternative methods to estimate bycatch were formulated and evaluated in the SBRM report. On p. 135 it is stated:

*"Three methods were examined to estimate annual total discards, precision, and coverage necessary to achieve a 30 percent CV for fleets and species/species groups: (1) A separate ratio method; (2) a combined ratio method; and (3) a simple expansion method (mean discard per trip). Cochran (1963) discusses these three methods in greater detail. Each method utilized quarterly estimates of bycatch rates (d/k and d/da) and associated CV, and the number of sea days necessary to achieve a CV of 30 percent. In these analyses, stratum is defined as fleet and species group. Significant improvements in discard estimation may be possible through a variety of species-specific refinements. These might be accomplished via use of additional covariates, post stratification, or other model-based approaches."*

The first two methods are applied to two different ratios, i.e., (i) the ratio of bycatch to days at sea, (ii) the ratio of bycatch to kept biomass. The third method, the bycatch rate per trip, is applied in two different ways, i.e., to data formulated (i) from the days at sea and (ii) the kept biomass sampling frames which are not 100% overlapping.

While the formulation of a total of six alternative estimators appears to be a reasonable number to evaluate and choose from, this is a relatively limited set of alternatives to chose from, as indicated in the report which provides references to several other bycatch estimation methods also. My general impression is that these particular estimators are not very well suited to the bycatch and effort data presented in the report (see below for further details). On this basis, I would hesitate to argue that simply <u>more</u> or <u>different</u> estimators of discard should have been formulated and applied as alternative candidates. Instead, I would advocate that some further careful inspection of the bycatch data (e.g., as shown in Appendix plots B-1 (non-protected species) and B-2 (protected species)) be carried out to formulate and apply estimators of bycatch that more accurately model the observer bycatch data at the very least and bycatch and effort data, if at all possible.

## III. COMMENTS ON THE SBRM'S EVALUATION OF ASSUMPTIONS OF THE RATIO ESTIMATORS

When a new estimator is proposed to be applied to some data, it is common practice to evaluate whether the known assumptions of the estimator are satisfied with regards to the available data. The report appropriately proceeds to evaluate whether ratio estimator assumptions are satisfied in the observer data set. It considers two different sets of assumptions, one concerning the degree of correlation between the numerator and denominator of the ratio applied, and another concerning the linearity assumptions of the ratio.

### A. Assumption 1: correlation between discards and the measure of effort

One of the identified requirements of a ratio estimator is that a positive correlation exists between the numerator and denominator of the ratio. When there is a significant positive correlation between these two variables, this can help to reduce the variance in the estimate of the total bycatch compared to an estimator that does not used the ratio, e.g., the simple expansion method. The report evaluates the correlations between observer discards and the two different measures of effort, kept biomass and days at sea (das). Table 42 shows these correlations by gear type for the various species and species groups. Table 43 does so for the various gear type by protected species. General conclusions offered in the report on p. 134 are that:

*"Overall, the correlation coefficients were low but the exceptions are important and notable."*

I agree that overall correlations were low. However, the authors do not specified explicitly what values they consider to be unacceptably low so that a ratio estimator would be inappropriate, or acceptably high such that ratio estimator would be appropriate. Is 0.2, sufficiently high? Is 0.5 sufficiently high? Should the estimate of the correlation coefficient be significant at the 0.05 alpha level? None of this information was provided and this makes it difficult to use the information in Tables 42 and 43 to evaluate in which instances, ratio estimators would be applicable and in which instances not. Moreover, Tables 42 and 43 do not provide indications of which estimates of correlations are significant. Providing estimates of whether a correlation estimate is significantly different from zero would help in evaluating which once are reliably obtained.

Presuming that correlations of 0.5 or 0.7 could imply that the ratio estimator might be appropriate, this still leaves very few instances where a ratio estimator would be more suitable than for example the simple expansion method. For example, in Table 42, if I have tallied

correctly, 199 cells (combinations of fishing modes and species group (non-protected)) have estimates of the correlation between discards and discard to kept.  Of these, 20 cells (roughly 10% of the correlations) have correlation coefficients larger than 0.5, and 8 cells (roughly 4%) have correlation coefficients larger than 0.7.  Given the fact that 75% of the cells have fewer than 30 data points as noted on p. 134, I'd suspect that the correlation coefficient would need to be quite high before the correlation was found to be significant.  Also, a correlation coefficient of about 0.7 would imply that about 49% of the variance in discards can be explained by variation in kept biomass.  If a correlation of approximately 0.7 or higher was significant and implied that a ratio estimate could be suitable, the fraction of significant correlations is approximately equal to the 5% alpha level, i.e., the faction of instances in which you'd expect to get a significant correlation by chance alone.

In contrast, the report on p. 134 points to a number of instances where it claims there are "exceptions".  In some instances, these have correlation coefficients of 0.2, in others, 0.32, and in yet others, 0.48.  These benchmark values still seem pretty low and there's no indication of whether the estimated coefficients are significantly different from zero.  It is concluded on p. 134 that:

*"The evidence indicates strong relationships for the three primary fisheries (large-mesh otter trawls, extra-large-mesh gillnets, and scallop dredges)".*

This is misleading.  For large-mesh otter trawls 2/13 have correlation coefficients larger than 0.5 in the NE and 0/11 have correlation coefficients larger than 0.5 in the MA.  For extra-large mesh gillnets none in the NE and MA have correlation coefficients larger than 0.5.  For scallop dredges only 3 in 62 instances have correlation coefficients larger than 0.5.  In contrast, though its not stated, the MA small sink-anchor-gillnet has correlation coefficients over 0.95 for the three species groups where the coefficients are computed, i.e., of 0.993 for mackerel, squid and butterfish, 0.981 for dogfish, and 0.993 for fluke, scup, black sea bass.  The MA large sink-anchor-gillnet has correlation coefficients over 0.5 for all four species where the coefficients are computed, i.e., of 0.575 for bluefish, 0.507 for NE multispecies, 0.652 for skate and 0.664 for dogfish.  However, in none of the 22 other gear types, where there are three or more species groups, are more than 50% of correlation coefficients larger than about 0.5.   Thus, which ever way you look at it, the results in tables 42 and 43 suggest that the vast majority of correlations are low and by this standard the ratio estimator would not be appropriate in the vast majority of cases.

### B. Assumption 2:  linearity assumptions.

On , p. 135  the following is stated:

*"The ratio estimator assumes that a zero intercept regression is an appropriate model of the relationship between discard and kept (or days absent). ... [U]sing a fourth root transformation, examples of the comparison between discard and kept (or days absent) are illustrated by thirteen fish species groups in otter trawl and gillnet gears by mesh sizes (presented in Appendix B, Figures B-1a to B-1xx) and by five protected species groups for longline, otter trawl, gillnet and scallop dredge (Appendix B, Figures B-2a to B-2j). Departures from linearity are often controlled by large numbers of trips with zero discards.  When trips with zero discards are removed, improvement in linearity occurs. Examples of these are given for large-mesh groundfish discarded in the otter trawl and gillnet fleets (Appendix B, Figures B-3a to B-3d). Rho and sample size analyses (using power = 0.80, alpha = 0.10; alternative hypothesis = 'not*

*equal' and null value = 0) indicated that a low percentage of fleets and species groups had linear relationships using a ratio estimator (d/k or d/da)."*

Many of the plots in B-1 and B-2 (with fourth root transformation of the data) show many zero observations over many different values for trip durations and kept biomass, and where positive bycatch occurs, either no apparent relationship (correlation not different from zero) or some potentially positive correlation with kept biomass (k) and days at sea (das).  It is thus correctly pointed out that "a low percentage of fleets and species groups had linear relationships using a ratio estimator (d/k or d/da)".  This provides further evidence that a ratio estimator is not appropriate for the observer bycatch and kept biomass data.  Thus, both key assumptions of the ratio estimator, that there is sufficiently large positive correlation (though not adequately defined in the report) between observer bycatch values and kept biomass, and that there is a significant positive linear relationship that intersects zero, do not hold in the vast majority of fishing mode – species group instances.  Despite this, the report puts aside the one non-ratio estimator that could have still been appropriate, i.e., the simple expansion method, and applies the combined ratio estimator with discard to kept ratio in all instances.  Because two key ratio method assumptions do not hold for the vast majority of instances, yet a ratio method is still applied, this could introduce serious bias in the bycatch estimates, CVs, and prescribed levels of observer coverage in the SBRM.

While, the statement, "[w]hen trips with zero discards are removed, improvement in linearity occurs…", is true, it appears that significant positive linear relationships emerge in only a small fraction of the instances shown (e.g., only two of sixteen plots in Figures 4).  Moreover, the ratio estimators applied still presumably include the zeros and do nothing to account for their high frequency.  The point about the improvement in linearity when zero discard observations are removed thus appears to be a moot point.

Quite worrisomely, none of the six bycatch estimators applied account for the large frequency of zero bycatch observations in most of the plots bycatch against k and das in Figures B-1 and B-2.  For the last few decades, it has been common in fisheries data analysis, to apply for example, delta-lognormal GLM method estimators, where there appears to be a larger-than-expected fraction of zero observations (e.g., ICCAT 2003).  Delta-negative binomial GLM methods have also been applied in estimation of red snapper bycatch in shrimp trawl fisheries in the Gulf of Mexico to account for the high frequency of zero bycatch observations, the over-dispersion in the bycatch observations and to utilize covariates in the estimation of bycatch (Nichols 2004).  Such methods model the chance of a zero response together with the value for positive responses as a function of various covariates.  The commonly applied delta-lognormal method estimator models the chance of a zero observation using the binomial distribution, and the values of positive observations using some form of GLM model.  In this particular instance, the majority of the bycatch datasets could potentially be modeled more accurately with some form of delta-lognormal or delta-negative binomial model.

It should be noted however, that in many instances, even if a delta-lognormal model approach were to be applied, with a GLM model fitted to the positive bycatch observations, there may be no underlying positive relationship between the positive observations for discards and the utilized measures of fishing effort, i.e., das or k.  One possible explanation in some instances for the lack of positive correlation between bycatch and say kept biomass is that there may be a gear saturation effect at high bycatch levels, such that when kept biomass happens to be high, the gear

is saturated with kept biomass and there's little room in it for bycatch. Such potential explanations for the lack of positive relationship between bycatch and effort observations were not mentioned anywhere in the report. Gear saturation effects are plausible for gillnets, traps and trawl nets and correlations of close to zero despite large numbers of positive observations can be seen for each of these gear types (e.g., in Figs. B 1hh, 1ll, 1jj, 1nn, 1pp).

Thus, at present, it appears that the choice of a ratio estimator for discards is not appropriate for the majority of fishing mode-species group instances. It could be appropriate in a few instances, e.g., where the assumptions are met, but these are a very small minority of the instances. One possible improvement would thus be to apply the simple expansion method to all instances where the two key ratio assumptions are found not to hold, and a ratio estimator to those few instances in which the two key assumptions are well supported. It may also be appropriate to identify and investigate the usefulness of bycatch estimators that are appropriate to instances in which there is a large number of zero observations, as is the case in most of the fishing mode-species group instances (e.g., as in Nichols 2004).

## IV. COMMENTS ON THE CHOICE OF THE COMBINED RATIO METHOD USING THE DISCARDS TO KEPT POUNDS RATIO

It is reported that a combined ratio method, using discards to kept pounds ratio, was selected and applied to all fishing modes, species and species group combinations.

p. iv (Executive Summary): *"In the end, the combined ratio method was selected using discard to- kept pounds. Data for kept pounds are more easily verified than data for days absent, and the combined ratio method better utilized information associated with kept pounds."*

In general, I've found that (1) the criteria that the authors of the SBRM report applied to choose among the six alternative were not very well explained or justified, (2) the criteria that appeared to be applied to choose a bycatch estimator did not appear to be applied in a consistent manner in the final choice of an estimator of total bycatch, (3) the section in Chapter 5 that compares the results from the different estimators and goes on to apparently choose an estimator, did not provide a clear statement about which estimator was chosen for application and precisely why it was chosen over and above the other candidate estimators, and (4) the overall approach taken to evaluate and choose among the estimators falls below the standards of rigor usually applied in evaluations of alternative estimators.

The only statement I could find in Chapter 5 that indicates the combined estimator as the method of choice is as follows:

p. 143: *"The tables presenting precision (Table 44 and Table 45), ranking of total discards (Table 46, Table 47, Table 48, and Table 49), and the sea days and trips necessary to achieve a CV of 30 percent (Table 50-Table 55) are based upon the variance of the composite annual total discards using the combined ratio method (method 2)."*

This statement does not reveal as it should the authors' choice also of the discards to kept in pounds ratio; nor is a clear summary statement provided about why this particular bycatch estimator was chosen. Also, the estimation method applied to produce the results in the Tables referred to in this paragraph is not mentioned anywhere in the Table captions for these Tables.

Apparent supporting statements about the combined ratio estimator and discards-to-kept ratio include:

p. 142-143.  *"In general, results in Figures B-5h to B-5n of Appendix B suggested a greater degree of dispersion among methods 1 to 3 when days absent was used as a measure of fishing effort. Since days absent does not account for variations in steam time versus fishing time nor the effects of soak time for fixed gear, it was judged to be less useful than estimators based on a discard-to-kept ratio. In particular, estimators based on the separate ratio method were more variable than those based on the combined ratio method."*

The report here does not refer to any results (Tables or Figures) that would support the conclusion that "estimators based on the separate ratio method were more variable than those based on the combined ratio method." Though it is not pointed out, Appendix B, Figures B-5h plot CVs in estimate of bycatch obtained from the six different estimators. In three out of seven instances, these show that the CVs from the combined ratio method are lower than those from the separate ratio method. In the other four instances, the CVs appear to be identical between the two methods. There are results presented in Fig. B 6a -B6g that allow comparisons of the CVs in the discard estimates between the combined ratio method and the simple expansion method. Why weren't similar figures produced for the comparison of separate ratio method and combined ratio method (D1, D2)? This would have provided additional information helpful for evaluating whether this conclusion was justified.

I found that the comparisons made between the combined ratio and simple expansion methods to be inaccurate. It is stated on p. 143.

*"Closer examination of the comparison of precision from the combined ratio method and the simple expansion method are presented in Appendix B, Figures B-6a to B-6g, for four major gear types (longline, otter trawl, gillnet, and scallop dredge). In these figures, the identity line and a reference line representing a 30 percent CV are given; the symbol represents a species/species group and mesh size. There is general symmetry above and below the identity line, except for Mid-Atlantic otter trawl where coverage is low and precision estimates are higher, consequentially leading to higher coverage."*

From my inspection of Figures B-6a to B-6g, I was unable to verify the statement: "There is general symmetry above and below the identity line, except for Mid-Atlantic otter trawl". In contrast, the most common pattern is asymmetry with the majority of the points resting above the identity line. For example, Figures B-6b, B6c, B6d, B6e, B6f, B6g all show that for eleven of fourteen cases shown, i.e., three of the otter trawl plots (except for one of four plots here, the NE dda ratio estimator), the four scallop dredge plots, and the four gillnet plots, substantially more than 50% of the CVs from the simple expansion method were less than the CVs from the combined ratio method. Only for three of fourteen cases, i.e., NE long line DDA and DK and NE otter trawl for the DDA ratio, was there apparent symmetry. This means that in the vast majority of fishing method-species group combinations, the CVs in bycatch estimates are lower for the simple expansion method than for the combined ratio method. Here, there is direct evidence of this, and yet it is incorrectly claimed that there is general asymmetry when in fact, the simple expansion method is providing more precise estimates in the vast majority of instances than the combined ratio method. And while it is argued on p. 143 (without any reference to supporting evidence) that the combined ratio method provided more precise estimates of bycatch than the separate ratio method and is thus preferable to the separate ratio

method, a method with yet higher precision in the majority of cases shown is rejected over an estimator that has lower precision.

Despite the higher precision offered in the majority of the instances by the simple expansion method compared to the combined ratio method, the reason for choosing the combined method over the simple expansion method was not made clear (I was unable to locate the precise explanation). It seems that it may have been based on the apparently incorrect presumption of symmetry in CV estimates above and below the identity line in the CV plots shown in Figures B-6a-B6g and the presumption that the ratio method can provide higher precision due to the presumption of a positive correlation between the variables in the numerator and denominator of the ratio, as considered on p. 133-134 of the report (see above).

Thus, the criteria applied in the selection of an estimator appear to be inconsistently and incorrectly applied. The two key assumptions for the ratio estimators do not hold in the majority of fishing mode-species group instances, i.e., it appears that no significant positive correlation of a sufficiently large magnitude holds for the vast majority of instances (Tables 42 and 43) and that in only a small fraction of instances does a positive linear model fit the observer discards and kept data (Figures B-1, B-2. B-3). For example, the SBRM report, indicates that the chosen estimator, i.e., the combined method with the discard to kept ratio, is an inappropriate choice for an estimator and indicate that further research is required to identify estimators that are more appropriate to the available data.


## V. COMMENTS ON WHAT'S MISSING IN THE EVALUATION OF ESTIMATORS.

It is common practice in stock assessment and the field of statistics to evaluate the potential bias/accuracy and precision in proposed estimators using data simulated from models with fixed properties that plausibility mimic the data and situation to which the models are proposed to be fitted (e.g. Punt 1993). This is analogous to safety and quality control testing methods applied to new proposed items for mass consumption by the public such as new cars. A rigorous battery of tests is applied to ensure that new proposed cars function as intended and meet national safety standards.

Simulation of mock datasets to test estimators is such a commonly applied approach to test for bias in proposed estimators that there is no need to go into a lot of detail here about this. It is surprising that the report does not show any such attempts to simulation evaluate the potential accuracy in the six alternative estimators. In my judgment, the SBRM is not complete until such simulation evaluations have been carried out and at least one estimator is identified that performs satisfactorily in the simulation evaluations.

To start with, a data simulator would need to be constructed that could simulate data with the same patterns seen in the observer bycatch and kept biomass data in Appendix B Figures B-1 and B-2. The high frequency of zeros in such datasets should be modeled as well as the apparent lack of positive linear relationship with kept biomass in the non-zero observer bycatch data. Some underlying true value for total bycatch for a given fishing mode-species group would need to be formulated and plausible models for how this translates to discards per biomass kept on a trip by trip basis. The error variability seen in the actual data should also be captured in the "mock" data simulator. Since the proposed estimators are relatively simple, it should be possible to simulate thousands of mock datasets from the underlying assumed true model for bycatch and

28

kept biomass per trip (or days at sea), fit each estimator to each of these datasets and then inspect the bias, mean square error in the estimate, precision in the estimates and accuracy of the percent coverage of the true value by the estimated 95% confidence intervals (or probability intervals) obtained from each of the proposed by catch estimators. Standards of acceptable performance would need to be defined beforehand, to outline what could be considered to be acceptable levels of precision and accuracy in estimates of bycatch and estimates of precision.

I thus conclude that an SBRM should not be approved until the proposed estimators of bycatch and the methods to estimate SEs in the SBRM are simulation-tested for their accuracy and precision and found to perform acceptably according to predefined tolerance levels for accuracy and precision.


**IS THE FILTERING PROCESS SCIENTIFICALLY SOUND**?

I have reviewed the filtering processes proposed, and in my view they are scientifically sound. I have no issues at all with the filtering methods proposed in the SBRM. They appear to be well-founded and sensible from a scientific point of view and in my view could lead to very little compromise in the quality of information provided yet considerably keep to reasonably low levels the amount of observer coverage required to meet the target levels of precision for the various bycatch species. My only comment concerns the fraction of fishing mortality rate filter.

p. 188. It is stated in one of the report given examples that

*"[a]pplying the mortality ratio filter (fourth level) at a threshold of 98 percent reduces the observer sea days necessary for this fishing mode to 1,229 days, which is the target level for sea turtles. Bluefish (2,231 sea days) is filtered at this stage as the discards of bluefish associated with this fishing mode contribute only 0.16 percent of the total fishing mortality on bluefish (including all commercial and recreational landings plus discards)."*

This ignores uncertainty in the discard estimates from existing observer datasets. e.g., discards of bluefish associated with this fishing model contributes only 0.16 percent of the total F on bluefish. If bycatch estimates are already imprecise due to low observer coverage, the use of point estimates e.g. if CVs are 0.3 or more give rather quite variable estimates of bycatch upon which to form a species filtering algorithm. This could lead to some species which are on the border of the tolerance level of e.g., 98 percent, being actively included in the observer coverage calculations in some years and not in others. This could have the undersirable result of yielding bycatch data that may swing between being highly imprecise to the target levels of precision and overall produce some time series with very poor quality. The fraction of instances in this category should be assessed to make sure that such instances are only a very small minority and that data for species of concern are not unduly impacted.


**Part 2: An independent scientific paper that either confirms the analysis and recommended levels of observer coverage contained in the SBRM or points out where it falls short and how it would need to be improved in order result in scientifically sound recommendations for observer coverage levels**. This review should include a discussion of specific high profile fisheries, including:

> o   NE Groundfish- discard mortality of groundfish in the fishery;

29

- o  NE/Mid-Atlantic Scallops- sea turtle and yellowtail flounder discards;
- o  NE Mid-water Trawl- bycatch of fish and protected species;
- o  Mid-Atlantic Trawl – bycatch of sea turtles in trawl nets

Time was too short to allow me to address in detail the four particular fisheries mentioned.  I can however provide some summary comments on "**how the SBRM would need to be improved in order result in scientifically sound recommendations for observer coverage levels**".

(1) The current SBRM is seriously flawed because it utilizes a ratio estimator to all fisheries mode-species group combinations when in the vast majority of them, the two key assumptions of ratio estimation do not hold, i.e., significant positive correlation between the denominator and numerator in the ratio and the ratio data are adequately modeled by a linear model that goes through the origin.  This can be seen to be the case for all gear types in all regions including groundfish and other trawl discards in Appendix B, Figures B1 whereby in only a tiny fraction of the instances shown were the linearity assumptions of the ratio estimator reasonably satisfied (i.e., a linear model fitting through the positive discard data and also the high frequency of zero discards data).  This was seen for all results for protected species including turtles in both regions for caught in all forms of fishing gear (e.g., Figures B2a and B2b).  Based on results in Tables 42 and 43 (NMFS 2007) indications of the fraction of instances for these four fisheries in which the requirement for there to be a positive correlation between bycatch and kept biomass might be met are provided below.  This, however, arbitrarily presumes that a correlation coefficient ($\rho$) of 0.5 for values of bycatch and kept biomass is acceptable.  Note that the particular level of $\rho$ that might be considered acceptable for the application of a ratio estimator remains unclear.

NE Groundfish- discard mortality of groundfish in the fishery

Commercial species

- NE otter trawl, small:  1/ 13 species had a $\rho > 0.5$.

- NE otter trawl, large:  2/ 13 species had a $\rho > 0.5$.

Protected species

- NE otter trawl, small:  0/ 2 species had a $\rho > 0.5$.

Conclusion: The assumption of a positive correlation appears to be met in very few instances and the estimation method may be unreliable


NE/Mid-Atlantic Scallops- sea turtle and yellowtail flounder discards

Commercial species

- NE:  3/ 31 instances had $\rho > 0.5$.

- MA:  1/ 31 instances had $\rho > 0.5$.

Protected species

- NE :  0/ 7 instances had $\rho > 0.5$.

- MA :  0/ 4 instances had $\rho > 0.5$.

Conclusion: The assumption of a positive correlation appears to be met in very few instances and the estimation method may be unreliable

NE Mid-water Trawl- bycatch of fish and protected species;

Fish

- 0/10 instances had $\rho > 0.5$

Protected species

- 0/4 instances had $\rho > 0.5$

Conclusion: The assumption of a positive correlation appear to be met in none of the instances shown and the estimation method may be unreliable

Mid-Atlantic Trawl – bycatch of sea turtles in trawl nets

- Otter trawl:  $\rho = 0.044$ (too low).

- Scallop trawl: $\rho = 0.981$ (ok).

Conclusion: Only for the scallop trawl would the discard to kept ratio method appear to be reliable

(2) The ratio estimators could thus be considered for application in only those few instances in which the two key assumptions of ratio estimators are satisfactorily met.  These ratio estimators could also be applied only in those instances in which the fraction of zero bycatch observations is very low with the bench mark level to be determined by simulation evaluation as suggested in recommendation 3 below.  Given the data presented in Figure B-2 for various protected species this would be in fact in none of instances, due to there being no instances in which positive linear relationships that go through the origin and also the positive bycatch observations.

(3) The prescriptions for sampling coverage for protected species in virtually all of the fisheries are likely to be unreliable due to the serious violations in assumptions of the estimators applied to the existing data.

(4) The simple expansion method should be considered instead as estimator of bycatch and in the amount of observer coverage necessary to obtain the desired level of precision.  This is because it does not require that the ratio assumptions be met and presumably might not be unduly affected by the high frequency of zeros in the observer bycatch data.  Results presented in the report also indicated that it provided higher precision than the combined method with the discard to kept ratio.

(5) All candidate bycatch estimators should be simulation-tested with simulated data with known properties that mimicked plausibly the currently available data to evaluate whether these estimators could provide acceptable accuracy and precision in estimates of bycatch in the full

variety of fishery mode and species group combinations in the mid-Atlantic and NE Atlantic regions.

(6) Only estimators that are quality control tested and found to meet commonly required standards of performance may be considered as provisional candidates for the SBRM. Such candidates should be found to perform acceptably well in all simulation test evaluations of precision and accuracy and wherever applied, it must be verified that the assumptions of the estimators are adequately met.

**Part 3: Some additional questions for the Reviewer to consider:**

1)  Will the Standardized Bycatch Reporting Methodology program described and analyzed in the EA provide estimates of bycatch with the expected precision (CV=30%)?

- It is conceivable that the computed precision could meet the target level of 30%. However, it may be the case that the estimates could have CVs quite different from 30% because in the vast majority of instances the two key assumptions of the ratio estimator are not met.  Thus, over many years, and presuming bycatch and kept biomass levels did not change much from year to year, and the same amount of observer coverage was applied, the realized interannual variation in the actual point estimates obtained could be considerably different and possibly larger than the CVs calculated using the Taylor Series estimate of the standard error of the estimate.
- Results in Figures B-5 and B-6 show that the simple expansion method could be expected to give more precise estimates of bycatch in the majority of instances.  The higher precision of the simple expansion method could also lead to lower number of observer days being required to meet the same target level of precision of 50%.  Because this method is more robust to poorly behaved bycatch and effort data than the ratio methods, it could be expected that it could provide more reliable better behaved estimates of discards and more reliable prescription for observer coverage.

2)  Will the SBRM provide discard and mortality information which can be used to monitor, enforce and regulate a fishery that is governed by Annual Catch Limits/Hard TAC's that are required under the recently reauthorized MSA?

- CVs of 30% in total catch estimates for a given exploited population would produce a large amount of error variability in catch estimates on an interannual basis (see Figure 1 below).  Most of the commonly applied stock assessment methods such as VPA, catch-age, and surplus production models assume that catch is known without error or with very little error (e.g., CV < 10%).  Having absolutely no error in catch estimates is almost never the case, but in many fisheries, particularly those managed by individual transferable quota (ITQ), catch seems to be estimated with fairly high precision and this assumption is not badly violated.  However, should the CV in the total catch approach 30%, this could cause the results from the methods and recommended TACs to vary quite a bit from year to year due to error variability in the catch data information, and thereby create a serious source of stock assessment error.  The effect of large amounts of error variability in landings estimates (e.g., CVs of 20 to 30%) on stock assessment and management performance in TAC systems has to my knowledge rarely been evaluated.  Accepting a 30% CV in bycatch and possibly landings estimates could conceivably be expected to be a major source of imprecision and possibly bias in stock assessments and the TAC recommendations that come out of them.  This would particularly be the case for instances in which bycatch made up a substantial fraction of total catch of a particular fish population.

Figure 1.  Graphical illustration of the expected variability in catch (or bycatch) estimates that could be obtained if target precision for catch estimation was set at (a) 20% and (b) 30%.  The true underlying catch in each year is 100 tons.  Thus simulated true catch is constant at 100 tons for all years in each graph.  The 10 trajectories in each graph show possible time series of catch estimates that could be expected to be obtained under these two alternative target levels of precision.  Note that the amount of error variability apparent in time series with 30% CVs in catch (or bycatch) estimates seems particularly high with many estimates being less than 50% and larger than 50% of the true value for catch.

a.



b.



34

3)  Does this reporting methodology account for rare bycatch events such as protected species?

- SBRM information and results on protected species are shown in many of the SBRM report's figures and tables separately from such for commercial species.  Prescriptions of observer effort for each of the fishing modes explicitly takes into account requirements to meet precision requirements for estimating protected species bycatch also.  The SBRM thus considers both protected and unprotected species in its evaluations of the assumptions of the estimation methods and the estimates produced.
- The problem of there being a high frequency of zero bycatch observations however is not adequately taken into account in the specification and evaluation of proposed bycatch estimation methods.  The ratio estimator chosen and applied in the SBRM is inappropriately applied to protected species because in none of the instances shown in Appendix Figure B2 does a linear model appear to adequately fit the data.  Where there are positive bycatch observations, the linear model fails to predict them because it goes mainly through the very large fraction of zero observations over a wide range of kept biomass values.  Also, in only 3 of 59 instances in Table 43, are correlations between discards and kept biomass larger than 0.7.
- Thus a "one-shoe size fits all" approach in the current SBRM is inadequately justified and inappropriate for the vast majority of fishing mode-protected species combinations.
- Whether it would be an overall better approach to tailor bycatch estimators to each particular species-fishing mode combination is a difficult issue.  But in principle, this approach could produce more reliable prescriptions for observer coverage and estimates of bycatch.  Such an approach however would require a lot more work than the preparation of an SBRM like the present one that applies a single bycatch estimation method to all instances.


4) Will the proposed methodology be sufficient to account for the change in fishing behavior caused by a fisheries observer (the observer effect)?

- Most of the empirical comparisons of landings and trip data from observed and unobserved trips shows some differences between observed and unobserved trips, particularly in the spatial distribution of fishing locations between observed and unobserved trips.

- However, while there are some detected differences (3 out of 11 instances) between observed and unobserved trips in landings, the report claims that the differences are relatively small, though no data are shown to confirm this.

- There currently appear to exist no data that can enable the estimation of the potential bias in discard estimates provided by observed trips relative to unobserved trips.  Thus apart from there being strong evidence of differences in spatial distribution of observed and unobserved trips there remains no way to accurately assess the potential bias that may be present in discard data from observed trips.

- It appeared that by installing VMS on vessels (Muraski et al. 2005), the spatial distributions of fishing effort became nearly identical between observed vessels and these VMS trips.  The implication here is that requiring the installation of VMS on all vessels whether observed or not, could potentially help to reduce differences in spatial

distribution of fishing trips between observed and unobserved trips. This could help to reduce some of the potential differences in bycatch between observed and unobserved trips. Requiring mandatory video monitoring of fishing operations, the obtaining of data on presence/ absence of all bycatch species on a haul by haul basis, and comparisons made between observed and unobserved trips could potentially have a similar effect but the video monitoring proposition seems to be still under consideration and there are many pros and cons that need to be weighed.

- In summary, the current methodology does not appear to account for the change in fishing behaviour caused by fisheries observers because it appears to assume that no such difference exists.

5) Is the apparent reliance on vessel trip reports, which are notoriously inaccurate, scientifically valid?

- The current SBRM bycatch estimator is a ratio estimator that is scaled up using unadjusted kept biomass estimates from FVTR data.

- Comparisons of landings from FVTR data and Dealer landings records show that in the majority of instances, FVTR landings data are 10 to 40% less than the Dealer records.

- The current SBRM, though revealing these systematic differences does not make any attempt to correct for them in its combined ratio method for estimating bycatch.

- Based on this, some negative bias can thus be expected to be introduced in bycatch estimates.

- Use of the simple expansion method estimator instead would use the records of total numbers of trips made from the FVTR data base. Presumably, the FVTR records of total numbers of fishing trips could be expected to be more accurate than its records of landings and provide possibly more reliable estimates.

This last point can be checked by comparing the 3rd and 2nd to last cells in the last row of Figures Appendix B-4a – B4g which compare for various fishing methods bycatch estimates obtained by the two discards to kept ratio methods (which use the FVTR landings data as expansion factors) and the simple expansion method which uses FVTR data on the number of trips but does not use the FVTR landings data. If there is no difference in the estimates of bycatch provided by the simple expansion method and the bycatch to discard ratio methods, the lines plotted should be the identity line and perfectly diagonal through the individual cell. Figure B4a (**New England longline**) shows both lines very close to the diagonal suggesting no systematic differences in the kept ratios estimates and the simple expansion method. Figure 4Bc (**New England otter trawl**) shows lines below the diagonal suggesting some positive bias in the discard to kept ratios estimates. Figures B4b and B4d (**Mid-Atlantic otter trawl and mid Atlantic scallop dredge**) shows lines very close to the diagonal suggesting no apparent difference between the simple expansion and the discard to kept ratios estimates. Figure B4e (**New England scallop dredge**) shows both lines very close to the diagonal suggesting no systematic differences between the discard to kept ratios estimates and the simple expansion method. Figure B4f (**Mid Atlantic gillnet**) shows considerable scatter in both plots but both lines well below the diagonal suggesting some potential strong positive bias in the discard to kept ratios estimates (relative to the simple expansion method). Figure B4g (**New England gillnet**) shows both lines very close to the diagonal suggesting no

36

systematic differences between the discard to kept ratios estimates and simple expansion method estimates.

Thus in two out of seven instances, there appear to be systematic differences in estimates obtained between the simple expansion method and the discard to kept ratio methods. What the comparisons of the simple expansion method and discards to kept ratio method suggest is potential for systematic differences between estimates provided by the discard to bycatch ratio and simple expansion method and systematic bias in at least one of these two alternative methods. The violation of the two key assumptions in the discards to kept ratio method for the majority of instances would suggest that in terms of bias, the expansion method is preferable.

Figures B-5h to B5n show that the CVs in estimates provided by the simple expansion method are systematically less than those provided by the combined ratio method in six out of the seven instances. Figures B-6a-B6g which compare the CV estimates from the simple expansion method and the combined ratio method also show that the simple expansion method gives lower CVs than the ratio method. Thus, based on the issues of both bias and precision, the simple expansion method shows superior properties when compared to the discard to kept ratio and combined method estimator. The choice of the combined method with the discards to kept ratio method for the SBRM thus is inappropriate and the simple expansion method considered and tested as a potential alternative candidate method.


Some additional comments

1. Other simple design-based estimators of discard could have been formulated and applied as alternative candidates but this was not done. I would recommend that at least one or two alternative types of estimators of bycatch be formulated together with formulae to compute their standard error. The potential accuracy of these alternative estimators should be compared with the proposed ratio estimators.

2. Only a single Taylor series approximation of variance is applied to estimate the standard error in the ratio estimators. In my view, the accuracy of this estimator of standard error should have been simulation evaluated for its accuracy in estimating standard error in the estimator. Bootstrap and jackknife estimators of the sampling distribution of estimators are also commonly applied in fisheries and the results from these are often more reliable than analytically derived approximation of standard error. I recommend that either bootstrap or jackknife variance estimators be applied to estimate the standard error in the estimators to evaluate the sensitivity of the estimate of SE to its method of calculation.

3. Data only from a single year was utilized to formulate a bycatch sampling protocol and it is proposed that the sampling coverage applied be updated each year based on the previous year's data. Given that there's been no simulation testing of the variance in the proposed estimators from a single year and no evaluation of how the estimates obtained and the variances in estimates obtained might vary between years, there is as yet no basis upon which to judge the reliability of the prescriptions for sampling that are provided on an annual basis and how these prescriptions might vary from year to year based on sampling error in the data. It could be the case the prescribed observer coverage by mode and species might vary wildly from year to year based on yet undetected instability in the estimators of standard error and bycatch. Further research on

how the estimators of bycatch by species and fishing mode could be expected to vary from year to year and how well they could be expected to track actual bycatch are thus recommended.

4.  It could be expected that bycatch amounts by species and fishing mode might change as a function of changes in fishing regulations, e.g., a change in minimum size regulations. Computation of annual estimates of bycatch by species and fishing mode from the last five years of historic observer data could help to enable some understanding of the ability of the proposed estimators to detect any changes in bycatch amounts as a result of changes in regulations and how variable bycatch estimates could be expected to be from year to year where there are no changes in regulations and whether the realized internannual variability in annual bycatch estimates can be seen to be a function of the amount of observer coverage in the different fishing modes.

5.  While bycatch is disaggregated to the gear-type and species level and in some instances species group level, and also disaggregated into the New England and Mid-Atlantic regions, this does not necessarily provide estimates of bycatch at the population level.  For example, it could be that in one region there may be more than one more or less spatially non-overlapping breeding population of a given bycatch species (e.g., there may be two or three populations of a commercial crab species in e.g. the mid-Atlantic region).  Yet the bycatch monitored is the region-wide bycatch and thus there will be no bycatch estimates possible at the population level. For some particular bycatch species which may have more than one spatially non-overlapping breeding population in a given region, it may be appropriate to disaggregate the SBRM further so that estimates of bycatch by breeding population are obtained, rather than aggregate estimates of bycatch across different breeding populations.  Without disaggregating the sampling information to the level of the range of a particular breeding population the impacts of bycatch on individual populations could be assessed.  This may however make the formulation of an SBRM at region-wide levels considerably more complicated.


## Acknowledgements

This work was initiated and supported by the Lenfest Ocean Program, which is managed by the Pew Charitable Trusts.


## References

ICCAT. 2003.  Report of the 2002 Atlantic bluefin tuna stock assessment session.  Collective Volume of Scientific Papers. ICCAT, 55(3): 710-937.

McAllister, M.K. 1998.  Modeling the effects of fish migration on bias and variability in area-swept estimates of fish biomass: a vector based approach Can. J. Fish. Aquat. Sci. 55, 2622-2641.

Murawski, S., S. Wigley, M. Fogarty, P. Rago and D. Mountain. 2005. Effort distribution and catch patterns adjacent to temperate MPAs. ICES J. Mar. Sci., 62/6: 1150-1165.

Nichols, S. 2004.  Some Bayesian approaches to estimation of shrimp fleet bycatch.  NOAA SE Fisheries Science Center.  SEDAR Data Workshop Report SEDAR7-DW3.

NMFS.  2007.  Northeast Region Standardized Bycatch Reporting Methodology.  An Omnibus Ammendment to the Fishery Management Plans of the Mid-Atlantic and New England Regional Fishery Management Councils.  Released for public comment by the National Oceanic and Atmospheric Administration on June 2007. http://www.nefmc.org/issues/sbrm/index.html

Peterman, R.M., 1990; Statistical Power Analysis can Improve Fisheries Research and Management, *Canadian Journal of Fisheries and Aquatic Sciences*, 47: 2-15.

Punt, A.E. 1993. The comparative performance of production-model and ad hoc tuned VPA based feedback-control management procedures for the stock of Cape hake off the west coast of South Africa. pp. 283-299. In: Smith, S.J., Hunt, J.J. and D. Rivard. eds. *Risk Evaluation and Biological Reference Points for Fisheries Management. Can. Spec. Publ. Fish. Aquat. Sci.* **120.**

Toft, C.A. and Shea, P.J., 1983; Detecting community-wide patterns: estimating power strengthens statistical inference, *The American Naturalist*, 122: 618-625.



1025 F Street NW, Suite 900, Washington, DC 20004
ph: 202.552.2131 • fx: 202.552.2299
email: info@lenfestocean.org
www.lenfestocean.org



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

THE DIRECTOR

Mr. Roger Fleming
Earthjustice
1042 Peabody Road
Appleton, Maine 04862

Dear Mr. Fleming:

Thank you for your letter to Secretary Gutierrez on behalf of the Northwest Atlantic Marine
Alliance and the Midcoast Fishermen's Association, requesting that the Secretary take
emergency action for the Northeast (NE) multispecies fishery under the Magnuson-Stevens
Fishery Conservation and Management Act. You submitted this request as a Petition for
Rulemaking pursuant to 5 U.S.C. 553(e) of the Administrative Procedure Act (APA), requesting
that the Secretary issue emergency regulations to permanently prohibit midwater trawl fishing in
areas closed by the NE Multispecies Fishery Management Plan (FMP).

The information included in the petition has been carefully considered, particularly the claim that
new information relevant to the bycatch of NE multispecies in the Atlantic herring fishery
warrants emergency action. After consulting with my staff and following agency review of the
most recent scientific information, I have concluded that the petition lacks sufficient information
to justify emergency rulemaking under the APA or the Magnuson-Stevens Act. Therefore, I
must deny your request.

The New England Fishery Management Council has considered prohibiting midwater trawls in
these closed areas before, and has determined that the bycatch of NE multispecies was not
sufficient to justify this action. The observer data available continue to suggest that bycatch
levels are within the range considered acceptable by the Council. Your petition does not contain
significant new information that demonstrates an emergency in the fishery. It would be
inappropriate to use the Secretary's emergency authority to revisit prior Council decisions in the
absence of substantive new information.

NOAA's National Marine Fisheries Service will continue to monitor the fishery using observers
and other available information. The Council's NE Multispecies Plan Development Team is
currently developing Amendment 16 to the NE Multispecies FMP, in part to address changes
needed to the current management regime to meet rebuilding targets. Stock assessments on the
managed groundfish stocks are also underway, which will provide up-to-date information on the
stock status and fishing mortality rates on these stocks. Council deliberations on this or future
actions are the most appropriate way to raise your concerns.

We will continue to work closely with the Council on the management of the groundfish fishery.
I urge you to continue to participate in the management process.

Sincerely,

William T. Hogarth, Ph.D.
THE ASSISTANT ADMINISTRATOR
FOR FISHERIES



Printed on Recycled Paper



BOZEMAN, MONTANA    DENVER, COLORADO    HONOLULU, HAWAII
INTERNATIONAL    JUNEAU, ALASKA    OAKLAND, CALIFORNIA
SEATTLE, WASHINGTON    TALLAHASSEE, FLORIDA    WASHINGTON, D.C.
ENVIRONMENTAL LAW CLINIC AT STANFORD UNIVERSITY

November 20, 2007

Samuel Rauch,
Deputy Assistant Administrator for Regulatory Programs
Adam Issenberg,
Supervisory Attorney Advisor General
1315 East West Highway
National Marine Fisheries Service
Silver Spring, MD 20910-3282

Dear Messrs Rauch and Issenberg:

Thank you for meeting with us on November 14, 2007 to discuss the petition for rulemaking filed October 12, 2007 by the Northwest Atlantic Marine Alliance and the Midcoast Fishermen's Alliance to exclude herring midwater trawlers from New England's groundfish closed areas.

We write to briefly reiterate our view that the situation in New England warrants an emergency rulemaking. As you know, the Secretary is authorized to promulgate emergency regulations or interim measures if "an emergency situation exists" or if "interim measures are needed to reduce overfishing" within a given fishery. 16 U.S.C. § 1855(c)(1). NMFS guidelines explain that an emergency situation in a given fishery results from recent, unforeseen events or recently discovered circumstances. 62 Fed. Reg. 44,421-44,422 (Aug. 21, 1997). The guidelines go on to state that an emergency rulemaking may be initiated if notice and comment rulemaking "would result in substantial damage or loss to a living marine resource" and immediate action is necessary to "prevent overfishing" or "other serious damage to the fishery resource or habitat." *Id.*

The petition shows that there is sufficient recent information to justify immediate action to exclude midwater trawl vessels from groundfish closed areas in order to reduce the overfishing of groundfish and help rebuild depleted groundfish populations. The June 2007 NMFS Status of the Stocks Report shows that the changes to the groundfish management plan over the past several years have not ended overfishing on 8 of 19 groundfish stocks, and that 13 stocks remain overfished. Meanwhile, mounting evidence shows that contrary to the assumptions made when midwater trawlers were allowed into closed areas, such vessels catch adult and juvenile groundfish, at times in significant amounts.

The concern over the amount of groundfish bycatch that is actually occurring is amplified by NMFS' bycatch program (SBRM) analysis released this summer, which shows that current observer coverage levels are insufficient to provide reliable bycatch estimates for this fishery. An independent peer review of that analysis completed in September, 2007 concludes that the picture is likely significantly worse than indicated, and that even with the higher observer coverage levels recommended in NMFS' analysis the bycatch monitoring program would likely underestimate the amount of bycatch occurring in the fishery.

We would also like to follow-up on one other aspect of our discussion. You indicated that NEFSC staff have said that when observer coverage was increased for the fishery, there was not a notable change in the amount of bycatch observed. In response, we indicated that Dr. MacAllister concluded that the SBRM analysis ignored important indications of bias in the observer data, and we stated our view that this is likely the result of insufficient observer coverage and protocols. We have since reviewed the observer coverage levels for the midwater and paired midwater trawl fisheries. These data show that prior to 2004 observer coverage averaged less than one percent. In 2004 coverage levels were increased



to 7 and 9.6 percent respectively, and in 2005 levels were at 15.1 and 17 percent, respectively. It is our understanding from the observer program that coverage levels for these fisheries have since been around three to five percent. These estimates may be somewhat misleading because currently many cod ends from trawl vessels on trips where an observer is present are never brought on board or otherwise observed before being dumped, and therefore those hauls/trips should be considered unobserved.

We do not believe that these levels of observer coverage are sufficient to overcome the "observer effect" (*see e.g.,* Babcock et. al. 2003). As indicated, there are also issues with observer protocols that need to be addressed and this has been acknowledged to the New England Fishery Management Council by the Northeast Fisheries Observer Program. One point of comparison worth noting is that observer coverage for similar vessels in excess of 125 feet in North Pacific fisheries have 100 percent observer coverage, while vessels between 60 and 125 feet have at least 30 percent coverage. Yet, even with the shortcomings in the Northeast, we noted in the petition that in 2004 there were significant amounts of juvenile groundfish bycatch discovered through enforcement actions, observer data from 2005 show at least 35,000 pounds of documented groundfish bycatch, and the most recent data made available to us on September 7, 2007 show that in 2006 there was over 25,000 pounds of groundfish bycatch documented (i.e., this is from a small number of observed trips that, if extrapolated, would approach three-fourths to one million pounds).

Again, we believe the information summarized here and discussed more fully in the petition provide ample justification for emergency action to reduce overfishing of groundfish and prevent further damage to the groundfish resource. The need to address this issue is especially important as New England groundfish stocks rebuild and, as admitted by the midwater trawl industry, the bycatch of groundfish becomes unavoidable.

The premise for allowing midwater trawl vessels into the groundfish closed areas over the objections of many groundfishermen was that the vessels would catch only negligible amounts of groundfish as bycatch. The available information shows that this premise simply does not hold true in the midwater trawl fishery.

We would be glad to confer with you or with your staff in the event you have further questions about the petition.

Very truly yours,

/s/

Roger Fleming
Stephen E. Roady

Cc: Patricia Kurkul

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF<br>**(EXCEPT IN U.S. PLAINTIFF CASES)** | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT<br>**(IN U.S. PLAINTIFF CASES ONLY)**<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |
| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

1 U.S. Government Plaintiff

2 U.S. Government Defendant

3 Federal Question
(U.S. Government Not a Party)

4 Diversity
(Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

| A. *Antitrust* | B. *Personal Injury/ Malpractice* | C. *Administrative Agency Review* | D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| 410 Antitrust | 310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Medical Malpractice<br>365 Product Liability<br>368 Asbestos Product Liability | 151 Medicare Act<br><br>Social Security:<br>861 HIA ((1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g)<br>864 SSID Title XVI<br>865 RSI (405(g)<br>Other Statutes<br>891 Agricultural Acts<br>892 Economic Stabilization Act<br>893 Environmental Matters<br>894 Energy Allocation Act<br>890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

## E. *General Civil (Other)* OR F. *Pro Se General Civil*

| Real Property<br>210 Land Condemnation<br>220 Foreclosure<br>230 Rent, Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property<br><br>Personal Property<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | Bankruptcy<br>422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br><br>Prisoner Petitions<br>535 Death Penalty<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br><br>Property Rights<br>820 Copyrights<br>830 Patent<br>840 Trademark<br><br>Federal Tax Suits<br>870 Taxes (US plaintiff or defendant<br>871 IRS-Third Party 26 USC 7609 | Forfeiture/Penalty<br>610 Agriculture<br>620 Other Food &Drug<br>625 Drug Related Seizure of Property 21 USC 881<br>630 Liquor Laws<br>640 RR & Truck<br>650 Airline Regs<br>660 Occupational Safety/Health<br>690 Other<br><br>Other Statutes<br>400 State Reapportionment<br>430 Banks & Banking<br>450 Commerce/ICC Rates/etc.<br>460 Deportation | 470 Racketeer Influenced & Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Satellite TV<br>810 Selective Service<br>850 Securities/Commodities/ Exchange<br>875 Customer Challenge 12 USC 3410<br>900 Appeal of fee determination under equal access to Justice<br>950 Constitutionality of State Statutes<br>890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| **G**. *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| **530 Habeas Corpus-General**<br>**510 Motion/Vacate Sentence** | **442 Civil Rights-Employment**<br>**(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)**<br><br>**\*(If pro se, select this deck)\*** | **895 Freedom of Information Act**<br>**890 Other Statutory Actions (if Privacy Act)**<br><br><br>**\*(If pro se, select this deck)\*** | **152 Recovery of Defaulted Student Loans (excluding veterans)** |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| **710 Fair Labor Standards Act**<br>**720 Labor/Mgmt. Relations**<br>**730 Labor/Mgmt. Reporting & Disclosure Act**<br>**740 Labor Railway Act**<br>**790 Other Labor Litigation**<br>**791 Empl. Ret. Inc. Security Act** | **441 Voting (if not Voting Rights Act)**<br>**443 Housing/Accommodations**<br>**444 Welfare**<br>**440 Other Civil Rights**<br>**445 American w/Disabilities-Employment**<br>**446 Americans w/Disabilities-Other** | **110 Insurance**<br>**120 Marine**<br>**130 Miller Act**<br>**140 Negotiable Instrument**<br>**150 Recovery of Overpayment & Enforcement of Judgment**<br>**153 Recovery of Overpayment of Veteran's Benefits**<br>**160 Stockholder's Suits**<br>**190 Other Contracts**<br>**195 Contract Product Liability**<br>**196 Franchise** | **441 Civil Rights-Voting (if Voting Rights Act)** |

## V. ORIGIN

| 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify) | 6 Multi district Litigation | 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>**YES**          **NO** |
|---|---|---|---|
| **VIII. RELATED CASE(S) IF ANY** | (See instruction)          **YES** | **NO** | If yes, please complete related case form. |

| **DATE** | **SIGNATURE OF ATTORNEY OF RECORD** |
|---|---|

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

**IV.**     CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.**     CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**     RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.